# EXHIBIT B – APPRAISAL
## [See Attached]

# Kurschat & Company

REAL ESTATE APPRAISERS AND CONSULTANTS

## APPRAISAL REPORT

Richmond Shopping Center
67300 - 67500 Main Street
Richmond, Michigan



FOR: **Warren Bank**
Bradford Quail
30068 Schoenherr
Warren, MI 48088
Phone: (586) 498-3300

BY: **Michael F. Kurschat, MAI, ASA, M.S.F.**
President/Appraiser
2075 West Big Beaver, Suite 222
Troy, Michigan 48084-3440
Phone: (248) 816-9166
Fax: (248) 816-9167

# TABLE OF CONTENTS

**SUMMARY** ........................................................................................................... **6**

**INTRODUCTORY INFORMATION** ..................................................................... **7**

   CLIENT ................................................................................................................ 7
   INTENDED USERS ............................................................................................ 7
   INTENDED USE OF THE APPRAISAL ........................................................... 7
   APPLICANT ........................................................................................................ 7
   PROPERTY LOCATION .................................................................................... 7
   LEGAL DESCRIPTION: ..................................................................................... 7
   PRESENT USE OF PROPERTY ...................................................................... 8

**ZONING** .............................................................................................................. **9**

   Intent .................................................................................................................. 9
   Allowed Uses ..................................................................................................... 9
   Conclusion .......................................................................................................... 9
   Zoning Map ....................................................................................................... 10

**PURPOSE OF THE APPRAISAL** ..................................................................... **11**

   Personal Property ............................................................................................ 11
   Trade Fixtures .................................................................................................. 11
   Intangible Assets ............................................................................................. 12

**APPRAISAL STANDARDS** ............................................................................... **13**

**LIMITING CONDITIONS** .................................................................................... **15**

**Highest and Best Use** ...................................................................................... **16**

   Highest and Best Use of Land as Though Vacant: ......................................... 17
   Highest and Best Use of Property as Improved: ............................................. 17

**INTEREST APPRAISED** .................................................................................... **18**

**TAX INFORMATION** ......................................................................................... **19**

**OWNERSHIP** ..................................................................................................... **21**

**SALES HISTORY** .............................................................................................. **21**

**SOIL CONDITIONS** ........................................................................................... **21**

**FLOOD HAZARD** .............................................................................................. **22**

**AREA DESCRIPTION** ....................................................................................... **23**

   Specific Neighborhood: .................................................................................... 28
   Detroit Metropolitan Freeway Map .................................................................. 32
   City Street Map ................................................................................................ 33
   Neighborhood Street Map ................................................................................ 34

**SITE DESCRIPTION**..................................................................................... **35**
    Plat Map ............................................................................................. 37
    Site Plan Drawing ............................................................................... 38

**IMPROVEMENTS DESCRIPTION**.................................................................. **39**
    Exterior ............................................................................................... 40
    Interior ................................................................................................ 41
    Summary: ............................................................................................ 42

**DISCUSSION OF THE APPRAISAL PROBLEM** ............................................. **52**

**COST APPROACH TO VALUE**....................................................................... **54**

**INCOME CAPITALIZATION APPROACH TO VALUE**....................................... **55**
    Comparable Rental Properties............................................................. 55
    Rental Adjustment Grid....................................................................... 64
    Satellite Units..................................................................................... 64
    Anchor Units ...................................................................................... 66
    Fee Simple Estate: ............................................................................. 67
    Vacancy and Credit Loss:................................................................... 68
    CAM Charges: .................................................................................... 69
    Expenses:........................................................................................... 69
    The Built-Up Rate: .............................................................................. 70
    The Extracted Rate ............................................................................ 72
    Yield Capitalization - Discounted Cash Flow ................................... 81
    Expenses:........................................................................................... 82
    Vacancies:.......................................................................................... 82
    Reversion: .......................................................................................... 82
    Discount Rate: .................................................................................... 83
    Discount Rate - Investment Analysis: ................................................ 83
    Discount Rate - Compared to Overall Capitalization Rate: .............. 85
    Summary - Income Approach: ............................................................ 88
    Required Repairs:............................................................................... 88

**SALES COMPARISON APPROACH TO VALUE** ............................................. **92**
    Comparable Sales .............................................................................. 92
    Sales Adjustment Grid ...................................................................... 104
    Required Repairs:............................................................................. 106

**EXPOSURE TIME AND MARKET CONDITIONS** ........................................... **107**

**RECONCILIATION** ...................................................................................... **108**

**QUALIFICATIONS OF THE APPRAISER** ...................................................... **109**

**ENGAGEMENT LETTER**............................................................................... **111**

**CERTIFICATE OF VALUE** ................................................................. **112**

# Kurschat & Company
## REAL ESTATE APPRAISERS AND CONSULTANTS

2075 W. BIG BEAVER ❖ SUITE 222 ❖ TROY, MI 48084-3440 ❖PHONE: (248) 816-9166 ❖ FAX: (248) 816-9167

July 12, 2004

**Warren Bank**
**Bradford Quail**
**30068 Schoenherr**
**Warren, MI 48088**
**Phone: (586) 498-3300**

Subject:  Appraisal Report
File No.407-103
Richmond Shopping Center
67300 - 67500 Main Street
Richmond, Michigan

Applicant:  Peter Beer & Ben Sorrentino

Gentlemen:

According to your recent request, I am submitting a valuation report for the subject property. I have conducted the required investigation, gathered the necessary data, and have made certain analyses that have enabled me to form an opinion of the market value of the fee simple interest of the subject property.

I certify that the property has been inspected, and that I have no present or contemplated future personal interest in said property. Also, my fee is in no way contingent upon the value reported. Based upon my investigation and analysis, and subject to the assumptions and limiting conditions set forth in this report, it is my opinion the market value of the subject property, as of July 10th, 2004, is:

### Seven Million Seven Hundred Thousand Dollars...... ($7,700,000)

Respectfully submitted,

Michael F. Kurschat, MAI, ASA, M.S.F.
President/Appraiser
Real Estate Appraiser - Lic. #1201000673

File 407-103

## SUMMARY

TYPE OF PROPERTY:                          Fourteen-Unit Strip Shopping Center

ZONING:                                    B-2, General Business District

TAX IDENTIFICATION NUMBER:                 06-01-426-026, 06-01-426-027

UTILITIES:                                 All Available

HIGHEST AND BEST USE:                      Commercial

LAND AREA:                                 862,787 S.F., or 19.807 Acres

BUILDING AREA:                             155,685 Square Feet

VALUATION:
COST APPROACH                              Not Applicable
INCOME APPROACH:                           $7,700,000
SALES COMPARISON APPROACH:                 $8,450,000

ESTIMATED VALUE:                           $7,700,000

DATE OF VALUE:                             July 10, 2004

DATE OF REPORT:                            July 12, 2004

## INTRODUCTORY INFORMATION

### CLIENT

Bradford Quail
Warren Bank
30068 Schoenherr
Warren, MI  48088
Phone: (586) 498-3300

This appraisal is being performed at the client's request.  The appraiser is obligated only to the client for this assignment, given the intended use and intended users of this report.

### INTENDED USERS

The client, Warren Bank, is the only intended user of this report. This appraisal is not intended to benefit the applicant, or any other persons.

### INTENDED USE OF THE APPRAISAL

This appraisal is intended to be used for mortgage loan security.  The appraisal was developed, and is reported in a manner appropriate for that use. No other uses are intended for this report.

### APPLICANT

Peter Beer & Ben Sorrentino
Phone: 248-557-1191

### PROPERTY LOCATION

67300 - 67500 Main Street
Main Street, just North of 31 Mile Road and West of Gratiot
City of Richmond
Macomb County, Michigan

### LEGAL DESCRIPTION:

67300 Main Street

SUPERVISORS PLAT NO 1 PART OF LOTS 29, 31 & 33 DESC AS BEG AT SE COR LOT 33; TH S88°49'30"W 66.0 FT ALG S LINE LOT 33; TH N0°46'20"W

210.0 FT; TH S88°49'30"W 792.95 FT; TH N04°06'54"E 423.25 FT; TH
S85°53'06"E 222.70 FT; TH N04°06'54"E 288 FT; TH S85°53'06"E 578.55 FT;
TH S0°46'20"E 844.36 FT ALG E LINE LOTS 29, 31 & 33 TO POB. 11.642 AC.
CITY OF RICHMOND

67500 Main Street

SUPERVISORS PLAT NO 1 PART OF LOTS 29, 31 & 33 & ALL OF LOT 32
TOGETHER DESC AS COM AT SE COR LOT 33; TH S88°49'30"W 609.10 FT
ALG S LINE LOT 33; TH N58°14'W 163.22 FT ALG NELY R/W LINE OF MAIN
STREET M-19 TO POB; TH CONT N58°14'W 631.53 FT ALG SD R/W LINE; TH
N04°06'54"E 528.60 FT; TH S85°53'06"E 660 FT; TH S04°06'54"W 288.0 FT; TH
N85°53'06"W 222.70 FT; TH S04°06'54"W 423.25 FT; TH N88°49'30"E 122.95
FT; TH S04°16'14"W 121.79 FT TO POB. 8.164 AC CITY OF RICHMOND

## PRESENT USE OF PROPERTY

The subject is a fourteen-unit strip shopping center that was built in 1981. Ten of
the fourteen units are currently occupied. Those tenants include: CVS
Pharmacy, Hallmark, Super Nails, The Cleaners, Tropical Tan, Glik's, New York
Deli, Radio Shack, Grondins and Kmart. Three of the vacant units are typical
small units that were formerly occupied by Little Ceasers Pizza, Bell Jewelry and
Fraser Optical. The fourth vacant unit is an anchor unit formerly occupied by a
Kroger grocery store.

## ZONING

B-2, General Business District

### Intent

The B-2, General Business District, is established to provide for a high concentration of a wide variety of retail and service establishments.

### Allowed Uses

Permitted uses within the B-2, General Business Districts, include: office buildings; medical office, including clinics; facilities for human care such as hospitals, sanitariums, rest and convalescent homes; banks, credit unions, savings and loans associations; personal service establishments including barber shops, beauty shops, and health salons; off-street parking lots; churches; restaurants; theaters, assembly halls, concert halls or similar places; dry cleaning establishments or pick up stations; post office and similar governmental office buildings; any retail business or service establishment whose principal activity is the sale of merchandise in an enclosed building; any service establishment of an office, showroom, or workshop nature; private clubs, fraternal organizations and lodge halls; business schools and colleges or private schools; auto laundries (car wash); bus passenger stations.

Permitted uses subject to special conditions include: outdoor sales space for sale of new or used automobiles, house trailers, or rental of trailers and/or automobiles; motels; drive-in businesses; veterinary hospitals or clinics; plant materials (nursery); recreational space providing children's amusement park and other similar recreation; indoor recreation facilities; automobile service centers; adult entertainment uses; auto repair and service facilities; retail uses which have an industrial character.

### Conclusion

The subject is a retail strip shopping center. This use generally conforms to the above zoning ordinance.

## Zoning Map



## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate market value of the property.

Market value is defined as the most probable price in terms of money which a property should bring in a competitive and open market, under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a. Buyer and seller are typically motivated.

b. Both parties are well informed or well advised, and each acting in what they consider their own best interest.

c. A reasonable time is allowed for exposure in the open market.

d. Payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto.

e. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This appraisal is to estimate the market value of the real estate only. It is not to include any personal property, trade fixtures, or intangible assets. The following definitions of those items as furnished by the "Real Estate Appraisal Terminology Handbook" as published by the Society of Real Estate Appraisers are:

### Personal Property

Generally, movable items; that is, those not permanently affixed to and a part of real estate. In deciding whether or not a thing is personal property or real estate, usually there must be considered (1) the manner in which it is annexed; (2) the intention of the party who made the annexation (that is, to leave permanently or to remove at some time); (3) the purpose for which the premises are used. Generally, and with exceptions, items remain personal property if they can be removed without serious injury either to the real estate or to the item itself.

### Trade Fixtures

A trade fixture, also called a chattel fixture, is an article that is owned and attached to a rented space or building by a tenant and used in conducting a business.

Examples of trade fixtures can be restaurant booths, storage tanks, cranes, or specialized equipment.

Intangible Assets

Items of property, such as franchises, trademarks, patents, copyrights, and goodwill; also such deferred items as development or organization expense may be used synonymously with intangible property.

Being aware of those items normally considered, or recognized as personal property, trade fixtures, or intangible assets, to the best of my knowledge, none are included in this report.

## APPRAISAL STANDARDS

This appraisal conforms to the "Uniform Standards of Professional Appraisal Practice" (USPAP). These appraisal standards were originally developed and copyrighted by the Appraisal Foundation in 1987. Since then, the USPAP has been adopted by the major appraisal organizations in North America and has become recognized as the generally accepted standards of appraisal practice.

The USPAP are amended periodically. In addition, the appraisal standards board of the Appraisal Foundation offers advisory opinions and statements on appraisal standards. Through amendments, revisions, statements, and advisory opinions, the standards are continually evolving to shape the nature and content of real estate appraisals today.

In the 1994 edition of the Uniform Standards of Professional Appraisal Practice, there are provisions for ethics, competency, departure from traditional guidelines, and definitions for appraisal practice. In addition, there are standards for the real property appraisal, and the reporting of the real property appraisal. This appraisal was developed in accordance with USPAP, and there was no departure from these standards. Therefore, this appraisal was developed as a "Complete Appraisal."

The "mid-year supplement" of the 1994 addition of USPAP includes significant revision in reporting standards. According to this revision, each written real property appraisal must be prepared under one of the following three (3) reporting options:

1) Self contained appraisal report

2) Summary appraisal report

3) Restricted appraisal report

This particular appraisal is written in conformance with this standard, and is written as a:

Self contained appraisal report

The self-contained appraisal report is considered to be the most detailed of the three appraisal reports. According to USPAP standards rule 2-2, this report must:

1) Identify and describe the real estate being appraised

2) State the real property interest being appraised

3) State the purpose and intended use of the appraisal

4) Define the value to be estimated

File 407-103

5) State the effective date of the appraisal and the date of the report

6) State the extent of the process of collecting, confirming, and reporting data

7) State all assumptions and limiting conditions that affect the analyses, opinions, and conclusions

8) Describe the information considered, the appraisal procedures followed, and the reasoning that supports the analyses, opinions, and conclusions

9) Describe the appraiser's opinion of the "Highest and Best Use" of the real estate, when such an opinion is necessary and appropriate

10) Explain and support the exclusion of any usual valuation approaches

11) Describe any additional information that may be appropriate to show compliance with, or clearly identify and explain permitted departures from the specific guidelines of Standard 1 (of USPAP)

12) Include a signed certificate in accordance with Standard Rule 2-3 (of USPAP)

This self contained appraisal report requires the appraiser to describe the data considered and the procedures that were followed in supporting the analyses, opinions, and conclusions in the written report. However, each item must be addressed in the depth and detail required by its significance to the appraisal. A written appraisal report is not expected to embody the extent of the appraiser's years of experience and knowledge on the various subjects contained in the appraisal report. This report is intended to contain sufficient detail to enable the reader to understand the appraiser's reasoning and conclusions.

## LIMITING CONDITIONS

This appraisal is subject to the following underlying assumptions and limiting conditions:

The legal description furnished is assumed to be correct.

No responsibility is assumed for matters legal in character, nor is any opinion rendered as to title, which is assumed to be good. All existing liens and encumbrances have been disregarded and the property appraised as though free and clear under responsible ownership and competent management, unless otherwise stated.

Information identified in this report as being furnished by others is believed to be reliable, but no responsibility is assumed for its accuracy.

Value assigned to improvements covered by this report are in proportion to the contribution said improvements make to the value of the property.

Fees for this appraisal report do not contemplate my appearance in court or with any government agency as an expert witness. Expert witness fees, conferences with principals and legal counsel, or any subsequent appraisal review time must be compensated for at professional rates in addition to the fee charged for this appraisal report.

Neither all nor any part of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media without my prior written consent and approval. This applies especially to the valuation conclusions or my identity.

No engineering survey of the property has been made. Any engineering map or plan furnished is assumed to be correct. Details in sketches furnished by the appraiser are descriptive in character, and although drawn to scale are meant to render close approximations.

In Michigan, appraisers are required to be licensed/certified and are regulated by the Michigan Department of Consumer and Industry Services, Licensing Division, P.O. Box 30018, Lansing, Michigan 48909.

File 407-103

## HIGHEST AND BEST USE

Highest and best use is defined in The Appraisal of Real Estate, Tenth Edition, Copyright 1992 by the Appraisal Institute (page 275) as follows:

> "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."

The highest and best use is determined by market forces, and reflects the most profitable likely use of a property. The property's specific characteristics are analyzed in the context of market demand, and the appraiser's opinion of highest and best use is rendered within the appraisal report.

The highest and best use analysis identifies the competitive market forces that interact with the subject property. The outcome will determine the type of comparable sales or rentals that will be utilized within each approach to value.

There are four criteria or tests that are utilized to determine the highest and best use of a property. The four tests, as outlined in The Appraisal of Real Estate, Tenth Edition, are generally considered sequentially. These tests are outlined as follows:

1) LEGALLY PERMISSIBLE. This test indicates that the use must be legally allowable under zoning ordinances and other use regulations.

2) PHYSICALLY POSSIBLE. Size, shape, and other conditions are analyzed to determine which uses are physically possible.

3) FINANCIALLY FEASIBLE. The proposed use must provide adequate return to adequately cover appropriate expenses and financial obligations.

4) MAXIMALLY PRODUCTIVE. Of the financially feasible uses, the highest and best use is the one that is the most profitable.

For each improved property, there is a highest and best use of the land as though vacant, and as improved. The highest and best use of the land may differ from the highest and best use of the property as improved. A difference in the two uses indicates obsolescence inherent in the improvements. In addition, the highest and best use of the subject site as though vacant must be presented to render an accurate land value. Therefore, the subject is analyzed as though vacant and as improved.

## Highest and Best Use of Land as Though Vacant:

Highest and best use of the land as though vacant assumes that the land is vacant or can be made vacant by demolishing any improvements. With this assumption, uses that create value can be identified, and the appraiser can begin to select comparable properties and estimate land value. Land as though vacant is a fundamental concept of valuation theory and the basis for the cost approach.

Analysis of the land as though vacant will determine the type of development, if any, that the subject site would be best suited for. A detailed analysis would indicate the type of building to be constructed, as well as its size, and other characteristics that are demanded in the market. The nature of the appraisal assignment, however, will determine the extent of analysis required in this section.

The subject site is located on a main thoroughfare, in an area of other commercial development. It is located in a densely developed community, and the property is zoned for commercial use.

The size of the site makes a wide variety of developments physically possible. In addition, the current zoning legally allows commercial development. The property is located in an area of other commercial development, and my analysis indicates a good demand for commercial development. These factors indicate that commercial development is likely to be financially feasible for the subject site. Since no other use is likely to provide a higher return to the subject land, the highest and best use of the subject land as though vacant is concluded to be for commercial development.

## Highest and Best Use of Property as Improved:

The subject is a fourteen-unit strip shopping center that was built in 1981.  Nine of the fourteen units are currently occupied.  Those tenants include: CVS Pharmacy, Hallmark, Super Nails, The Cleaners, Tropical Tan, Glik's, New York Deli, Radio Shack, Grondins and Kmart.

The site has adequate frontage on Main Street. It is apparent that commercial use is both physically possible and legally permissible. Current tenants within the building and leases of other commercial units in the area indicate that commercial use is financially feasible. Since no other use is likely to provide a higher return to the subject land, it is my opinion the highest and best use of the subject property is concluded to be for continued commercial use as a retail strip shopping center.

File 407-103

## INTEREST APPRAISED

Leased Fee Estate.  The leased fee estate is the value of the landlord's interest in a leased property.  It is defined by the American Institute of Real Estate Appraisers as:  "An ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor or the leased fee owner and leased fee are specified by contract terms contained within the lease.

The appraiser has also considered the value of the "Fee Simple Estate" of the subject property (as if unencumbered).

Title in Fee Simple is defined in Real Estate Appraisal Terminology, published jointly by the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, as: "An absolute fee, a fee without limitations to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, escheat, police power, and taxation. An inheritable estate."

Ownership in Fee Simple is also, and simply, defined as: "The fullest type of private ownership possible, subject to all public limitations." The property is appraised in Fee Simple Estate, as though free and clear of all liens and/or encumbrances, which might affect the value, or use, of subject property.

In instances where a building is leased above or below market for any significant amount of time, the leased fee estate may have a different value than the fee simple estate. In such an instance, the appraiser is obligated to report the impact of the actual lease, and reflect its impact on value.

In this particular instance, the K-Mart anchor is leased below market, with renewal options that have no escalators. As a result, the leased fee indicates a lower value than the fee simple estate.

File 407-103

## TAX INFORMATION

Real Property taxes in the State of Michigan are based on the value of the property. Thus, property taxes are known as an "ad valorum" tax system. A taxable value is established and multiplied against the annual tax rate, or millage rate, to arrive at the total tax bill. Property taxes are calculated using the following formula:

Taxable Value x Tax Rate (Millage Rate) = Tax Bill

In arriving at the taxable value of the property, a property assessment is made based on its "true cash value". The property assessment is required by law to be no more than 50% of the usual selling price or true cash value. Thus, as the property value rises, so the assessed value rises.

In 1994 legislation was passed that "capped" the taxable value of property. That is, the taxable value is not allowed to rise in excess of 5% per year, or the annual rate of inflation, which ever is lower. Thus, over time, the taxable value is likely to deviate lower than the assessed value.

The 1994 legislation requires that taxable values be adjusted to reflect market values whenever there is a "transfer of ownership". That is, if a property is sold, the taxable value is then changed to the higher assessed value, thereby raising annual real estate taxes. Thus, any informed purchaser would likely anticipate this increase in taxes.

Whenever there is a "transfer of ownership," as defined by Public Act 415 of 1994, the new owner of the property is required to complete a Property Transfer Affidavit. A transfer of ownership is a complicated issue, and includes any sales by deed or land contract, whether the sale is recorded or not. The legislation also dictates that a lease with options that total more than 35 years is also considered a transfer of ownership. Other transfers of ownership include conveyance to a trust, or a distribution from a trust. Foreclosures or forfeitures are not considered a transfer of ownership until the new owner has held the property for one (1) year or longer. These are important distinctions, since the new owner will be liable for back taxes, penalties, and interest if the change of ownership is not reported.

To calculate annual taxes for the subject, the taxable value is multiplied by the annual millage rate. Tax information for the subject is summarized as follows:

Municipality:                                        City of  Richmond
Tax Identification Number:                  06-01-426-026

| Year: | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|
| State Equal Value: | $2,020,468 | $2,006,756 | $1,724,680 | $1,517,015 |
| Taxable Value: | $1,301,704 | $1,282,467 | $1,242,701 | $1,204,168 |
| Millage Rate: | $57.72 | $59.49 | $59.61 | $58.49 |
| Total Taxes: | $75,137.83 | $76,294.70 | $74,072.31 | $70,431.18 |

Municipality:                                   City of  Richmond
Tax Identification Number:                  06-01-426-027

| Year: | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|
| State Equal Value: | $2,748,699 | $2,653,022 | $2,271,381 | $1,992,070 |
| Taxable Value: | $1,787,495 | $1,761,079 | $1,706,472 | $1,653,558 |
| Millage Rate: | $57.72 | $59.49 | $59.61 | $58.49 |
| Total Taxes: | $103,178 | $104,767 | $101,715 | $96,715 |

## OWNERSHIP

Ownership of property is a complicated legal issue, and may be described in several ways. An owner is commonly considered to be the person, or entity, who has legal title to a property, as evidenced by a deed transfer. Deeds are generally recorded at the county in which the property is located. However, legal title may be transferred via a deed without having the deed recorded.

Another form of ownership results when a property is purchased on a land contract. Legal title is not transferred until the contract is fulfilled. At fulfillment of the contract, legal title is usually transferred to the purchaser with a deed. In addition to land contract sales, there are other instances when a partial interest of a property is transferred. Examples of partial interests include dowers rights, easements, and mineral rights.

Because of complicated ownership issues, legal title is best determined by a title search. The appraiser has not made a title search, and no opinion is rendered as to legal title. No responsibility is assumed for these legal matters, and title is assumed to be good.

Tax records are commonly sent to the person who claims to own the subject property. In this instance, tax records indicate that the subject property is owned by:

> Stewart R Jacobson
> 280 N Old Woodward Ave
> Birmingham MI 48009-5392

## SALES HISTORY

No sales were noted.

## SOIL CONDITIONS

The soil conditions of the subject site are unknown. In addition, the appraiser is unaware of hazardous material or toxic waste on the subject property.

Your appraiser does not accept responsibility for any unknown and/or potentially environmentally unacceptable or hazardous materials and suggest that, if a determination of the possible presence of these materials in subject property is desirable, or required, that competent environmental consultants be contracted. The value estimate developed in this analysis is predicated on the assumption that there is no detrimental environmental contamination in, or near the property that would cause a limitation of use or a loss in value.

File 407-103

## FLOOD HAZARD

The appraiser has consulted the flood boundary map distributed by the National Flood Insurance Program. The City of Richmond and Richmond Township does not participate in the National Flood Insurance Program. Therefore, no map is available indicating a special flood hazard area of the subject.

## AREA DESCRIPTION

The value of a particular property is significantly affected by the various influences of the surrounding area. To address the characteristics of the area and its influences on the subject, an analysis of the surrounding general area is made. Various general and even global political divisions influence the subject. However, the more specific political divisions, such as county, and city or township, offer more specific information as to the competitive influences that impact the subject.

The influences affecting real estate are generally categorized as "Social, Economic, Governmental, or Environmental" forces. Relevant characteristics of the community that impact the subject are recognized in this section.

The subject's specific neighborhood is identified generally by those properties that are located physically near to the subject. In addition, those property types with a similar use are given particular attention. The analysis of the specific neighborhood offers insight as to the particular benefits or detriments that the subject's location offers.

### General Area:

The subject is located in the city of Richmond, in Macomb County, Michigan.

### Macomb County:

Macomb County is in southeastern Michigan and abuts the north side of the City of Detroit. The western border of Macomb County abuts Oakland County, while the eastern border abuts Lake St. Clair, Anchor Bay, and St. Clair County.

Macomb County contains the third largest population within the State of Michigan, having 788,149 persons in 2000. This is an increase of 70,749 persons, or 9.86%, from the 1990 population of 717,400. The 1990 population increased only 3.28% from the 1980 population of 694,600 persons. In terms of population movements, Macomb County is one of the fastest growing counties within the State of Michigan. Predominantly growth within Macomb County is occurring within the northern townships and cities. This grow is somewhat offset by nominal or negative growth within the southern most cities.

Total households within Macomb County equate to 309,198 in 2000, which represents a 16.66% increase over 1990's 265,048 households. The 1990 households increased 15.33% over 1980 when Macomb County contained 229,820 households. During the past twenty years, average household size has declined from 3.0 persons per household in 1980 to 2.68 persons per household in 1990 and 2.52 persons in 2000. This is an average decrease in household size

File 407-103

23

of 10.67% from 1980 to 1990 and 5.97% from 1990 to 2000. On the other hand, Macomb County contained 195,549 families in 1990, which represents a 6.44% increase over 1980.

Macomb County is also one of the wealthiest counties in Michigan, having a median household income (in 1999 dollars) of $52,102 in 2000 and $52,172 in 1990. During the same period, southeast Michigan's median household income was $49,979 and $46,511, respectively. Macomb County contains one of the lowest poverty level rates of 6% for 2000, up by 1% from 1990 poverty level.

Macomb County offers a wide variety of employment opportunities in various sectors of professional, manufacturing, service, and other areas of business activity. This wide variety of employment helps maintains Macomb County's relatively stable employment base, and one of the lowest unemployment rates within the State of Michigan. As of March, 1996, the diverse employment base of Macomb County was as follows:

| Employment Type | Number of Employers | %of Local Economy |
|---|---|---|
| Management & Professional | 84,230 | 23.7% |
| Sales | 42,441 | 11.9% |
| Administrative Support | 65,324 | 18.4% |
| Services | 40,821 | 11.5% |
| Farming | 2,229 | .6% |
| Precision Products | 50,640 | 14.2% |
| Machine Shop Operators | 53,791 | 15.1% |
| Technical | 16,227 | 4.6% |
| Total Employers | 355,676 | 100% |

The highways system, both existing and proposed, has caused a rapid expansion of residential growth in Macomb County. The I-94 (Edsel Ford) Freeway services the entire eastern half of the county. Van Dyke (M-53) Avenue services the entire western portion of the country. Hall (M-59) Road, a major east/west thoroughfare, serves as a connecting road between Macomb County and Oakland County. Hall (M-59) Road is the highest traveled road within the State of Michigan. The southern most portion of Macomb additionally benefits from I-696 and Baseline (M-102) Road, which additionally connects Macomb County with southern Oakland County and northern Wayne County.

The rapid residential growth has created a demand for many accompanying support services. These include a major shopping center area predominantly centering around Lakeside Mall. Lakeside Mall is a large upscale mall in Sterling

Heights, accommodating many of the residences within the central Macomb County. Lakeside Mall, located at the northeast section of the City of Sterling Heights, has created a substantial amount of commercial growth within Shelby Township, Macomb Township, and Clinton Township.

As of March, 1996, over 60 projects were proposed for economic development within Macomb County, spanning over 17 townships or cities. These proposed developments include a $55 million investment within the General Motors Technical Center in Warren, a $100 million investment in the K-Mart Superstore and ten retail and commercial operations within Sterling Heights, a $235 million investment to the Sterling Heights and Van Dyke plants of the Ford Motor Company, a $4.2 million investment in a new theater within Chesterfield Township, a $25 million investment in a 135,000 square foot metal stamping facility within Clinton Township, a $27.5 million investment in an intensive are unit and birthing center within the City of Mt. Clemens, and a $5.6 million investment in new equipment and machinery for the manufacture of anti-lock braking systems within the City of Memphis. In total of the 60 new proposed projects, total job creation of 3,850 new persons is anticipated, in addition to the 3,000+ jobs retained.

Manufacturing is Macomb County's leading industry, employing roughly one-third of the work force. Macomb County's 64 industrial parks, 8 community hospitals, the University Center, the Community College and its skilled work force, have made it the ideal location for many of the nation's leading manufacturers. Major domestic companies alone invested over $2.25 billion in Macomb County from 1990 to 1992. Major manufacturing employers include General Motors Corporation, Warren (21,000 employees), Chrysler Stamping Plan, Sterling Heights (3,900 employees), Ford Motor Company, Shelby Township (3,400 employees), Chrysler Assembly, Sterling Heights (3,350 employees), and Chrysler Truck, Warren (3,200 employees).

File 407-103

Overall, Macomb County's largest employers are:

| Name: | Full-Time Employees | Type of Business |
|---|---|---|
| General Motors Corporation | 19,400 | Auto Manufacturer |
| Chrysler Corporation | 17,463 | Auto Manufacturer |
| Ford Motor Company | 12,218 | Auto Manufacturer |
| Becker Group, Inc. | 1,800 | Automotive Project Mgmt. |
| Mt. Clemens General Hospital | 1,486 | Health Care |
| Modern Engineering, Inc. | 1,423 | Automotive Engineering |
| St. Joseph Mercy of Macomb | 1,320 | Health Care |
| Aetna Industries, Inc. | 1,288 | Automotive Metal Stamping |
| Lamb Technicon | 1,200 | Machine Tool Manufacturing |
| Detroit-Macomb Hospitals | 1,196 | Health Care |
| TRW Automotive | 1,111 | Automotive Components |
| Ameritech-Michigan | 924 | Telecommunication Services |
| DuPont | 760 | Auto Finishes |
| Macomb Community College | 746 | Higher Education |

As of 1996, there are over 740,000 persons living within 27 municipalities in Macomb County, including three of the ten largest communities in Michigan: Warren (3rd), Sterling Heights (6th), and Clinton Township (10th). With a land mass of 482 square miles, the County ranks third in both population and state equalized value of all 83 counties in the state. Currently, approximately 50% of Macomb County's total land area is urbanized. Macomb County's efficient system of roads and highways provide regional, national, and international access. Two interstates, I-94 and I-696, connect Macomb County to the rest of the state, nation, and Canada. Access to a third interstate, I-75, is provided by connecting routes on I-696 and M-59. ConRail and Grand Trunk Western Railroads service county industries.

Located on the eastern side of Macomb County, just north of Harrison Township, is the Selfridge Air National Guard Base. This federally owned and operated Air Base is considered a significant benefit to Macomb County. Creation of local employment through auxiliary businesses, and employment directly through this Air Force Base has proved to be a significant benefit within Macomb County.

Macomb County is well serviced with adequate educational facilities which include Baker College, Macomb County Community College (MCCC), and university extension centers of seven other state colleges, including Central Michigan, Eastern Michigan, Walsh College, and Wayne State University. 17.6% of Macomb County's residents, age 25 and older, hold a bachelor's degree or higher, compared to southeast Michigan average of 24.7%.

File 407-103

Macomb County is blessed with direct location on Lake St. Clair and Anchor Bay, in addition to several smaller lakes. Several areas within Macomb County are additionally benefited from recreational parks, including Metropolitan Beach, Stoney Creek Metro Park, Freedom Hill County Park, Dodge Park, and the Wilcott Mill Park. There are many more smaller parks and public golf courses. All of these features, roads, parks, transportation, entertainment, etc., have contributed to Macomb County's growth in population and supporting facilities.

City of Richmond:

The subject is located in the City of Richmond, Macomb County, Michigan. Richmond is located in southeastern Michigan and abuts the northerly side of the City of Detroit. A portion of the county's eastern border is along the shore Lake St. Clair. The southern half of Macomb County is most heavily developed. The northern half contains several smaller communities and the balance of the land is agricultural with scattered residences. However, the residential development has been sprawling northward over the past couple of decades.

Population has increased in Macomb County over the past 20 years. The 1980 census of 694,600 people showed a 10.92% increase over the 1970 population. The 1990 census indicated a more moderate increase of 3.28%, with total population rising to 717,400 people. Residents of Macomb County had an average per capita income of $16,187 in 1989.

The City of Richmond is a small community containing approximately 2.5 square miles. It is located in the northern portion of Macomb County, along its eastern edge. Gratiot Avenue, which extends northeasterly from the City of Detroit, passes just south and east of Richmond. Memphis Ridge (M-19) is the main north-south street that runs through the village. It travels north to the Village of Memphis, and joins Gratiot to the south. Thirty Two Mile Road (Division Street) is the main east- west road.

The Village is primarily composed of small single-family residences. There is also a downtown commercial district, composed of small retail stores, restaurants, and the like. Just outside the Village limits toward Gratiot are two large shopping centers. One is anchored by K-Mart, the other, located on Gratiot, is anchored by a grocery store. The surrounding communities of Richmond and Lenox Townships are primarily agricultural in nature.

Richmond has experienced significant growth over the past 10 years. In 1980, population was 3,536. The 1990 census reports a population of 4,141, indicating a 17% increase over the 10 year period, and the 2000 census reports a population of 4,896 indicating a further increase of 18.23% over that 10 year

File 407-103

27

period.  The census bureau estimated 2000 median income to be $43,378, which is just below the state average of $49,979.

The City of Richmond is surrounded by Richmond Township to the north, and Lenox Township to the south.  Both are primarily agricultural in nature, and have experienced little growth over the past ten years.  The 2000 population of Richmond Township was  3,416 persons, indicating a 35% increase since 1990. Lenox Township had a population of 3,069 persons, with a 1.35% increase since its 1980 population of 3,028 persons.

Some of the vital demographic characteristics for Richmond and surrounding communities are summarized as follows:

| Community | 1990 Population | 2000 Population | % Change | Median Income |
|---|---|---|---|---|
| **Richmond City** | 4,141 | 4,896 | 18.23% | $43,378 |
| Macomb County | 717,400 | 788,149 | 9.86% | $52,102 |
| Richmond Twp. | 2,528 | 3,416 | 35.13% | $69,449 |
| Lenox Twp. | 3,069 | 5,362 | 74.71% | $56,661 |
| Ray Twp. | 3,230 | 3,740 | 15.79% | $70,081 |
| Armada Twp. | 2,943 | 3,673 | 24.80% | $74,750 |
| Armada Village | 1,548 | 1,573 | 1.61% | $61,700 |
| New Haven | 2,331 | 3,071 | 31.75% | $40,699 |

The above data indicates that the City of Richmond is a rapidly growing community, as are the surrounding communities of Richmond Township, Lenox Township, Armada Township, Ray Township and New Haven.  All have experienced significant growth over the past ten years.  In addition, all are typical blue-collar communities.  Residents in the City of Richmond experienced a per capita income that is slightly below that of Macomb County as a whole, as well as other communities such as Richmond Township, Ray Township, and Armada Township.  Richmond is considered a slightly more affluent community than New Haven.  Overall, the City of Richmond is considered to be a typical rural community that is experiencing significant growth.

Specific Neighborhood:

The subject is more specifically located on the north side of Gratiot Avenue, just north of 31 Mile. This portion of Gratiot Avenue branches off to the west and becomes Main Street just a few blocks west of the subject. Just over 100 yards east of the subject, Gratiot Avenue continues northward. Approximately ¾ Miles west of the subject is the downtown central business district of Richmond, which is a typical rural downtown.



Fronting on Gratiot at the front of the subject lot are a Standard Federal Bank and a Burger King. Directly across from the subject is a freestanding Nextel store and a small strip shopping center that includes M&B Graphics, Leongs Chinese and American Restaurant, Subway, and Smokey's Smoke Shop.

The north side of Main west of the subject is developed with The Estates of Lake Angelus spec homes, which is adjacent to the subject property, a Coldwell Banker real estate office, Richmond Insurance Company, Family Chiropractic, a strip shopping center that includes David Andrew Hair Design and Hungry



Howie's, Bailey Dental Group, Richmond Medical, Speedway gas station, Mega Video, a small vacant office building, the Plaza of Richmond office plaza, which includes Curves for Women, Tera Tech, Dick Huavere Land, Enterprise Rent-a-Car, Macomb Family Services, Inc., Roseburn Agency, Inc., and Children's Healthcare.

Continuing along Main is Dick Huavere's Chrysler Dodge Dealership, Penzoil Ten Minute Oil Change, Richmond Interiors, McDonald's, Taco Bell, a small used car dealership, and then some residential homes.

East of the subject, heading toward northbound Gratiot includes First State Bank, Standard Federal Bank, Speedway gas station, an air conditioning company and a small strip shopping center that includes Capozzos Furniture, Everything Automotive, and a vacant unit formerly occupied by Gap Sports section.



Southbound Gratiot includes Richmond Brake Specialist, Marion's Studio Photography, Bregman's Inlanders, St. Peter's Lutheran Church, A-Team Liquor, Ace Hardware and Lumber, and J.J. Knapps Tavern and two strip shopping centers whose tenants include Blockbuster Video, Nail First, Belle Jewelry, Little Ceasers, Water to Go, H&R Block and Fantastic Sams, Rite Aid Drugs, Jet's Pizza, Dollar General, Golden Buffet, Quality Dollar, Makin Waves, Modern Hair Care, Century 21, Secretary of State, Steel City and Prestige Portraits.



In Summary, the subject is located along a main road in an area of dense commercial development and surrounded by a growing residential community.





## Detroit Metropolitan Freeway Map



## City Street Map



## Neighborhood Street Map



## SITE DESCRIPTION



| | |
|---|---|
| Location: | 67300 - 67500 Main Street<br>Main Street, just North of 31 Mile Road and West of Gratiot<br>Richmond, MI |
| Size: | 697.5' Frontage on Main Street (Gratiot)<br>832' in Depth |
| Shape: | Irregular |
| Area: | 862,787 S.F., or 19.807 Acres |
| Topography: | Mostly level at normal grade. There is a small retention pond located behind the building. |
| Landscaping: | Front side and rear greenbelt with adolescent trees and shrubs. Rear of site includes a large detention pond. |
| Utilities: | All available. |
| Parking: | Large asphalt-surfaced parking lot with pole lighting. The appraiser noticed some fallen light poles, and it appears that the poles fell as a result of rust and deterioration at the base of the pole. The appraiser |

counted 18 poles, each with 4 light fixtures. Assuming that all poles are in similar condition, most purchasers would likely replace all of the lighting and poles immediately.



## Plat Map



## Site Plan Drawing



## IMPROVEMENTS DESCRIPTION



Type:                    Richmond Shopping Center

Size:                    155,685 Square Feet

Age:                     1981

Condition:               Average

Exterior



| | |
|---|---|
| Walls: | Textured brick lower walls with a mixture of textured brick and painted wood siding upper walls. |
| Roof: | Plat metal deck roof with tinted glass mansard over grocery unit entrance. |
| Foundation: | Poured concrete. |
| Windows: | Tinted thermopane windows along front. |
| Doors: | Glass doors in metal frame along front. Metal personnel doors along side and rear elevations. Nine grade level metal overhead doors along side and rear. |
| Heat/Air Conditioning: | Individual roof-mounted package HVAC. |

Interior



Layout:                    The subject is designed to accommodate up to 14
                           individual tenants, with one large anchor unit at each
                           end, and is currently occupied by 10. The units vary in
                           size with rentable areas of approximately 1,167 Square
                           Feet to 89,175 square feet.

                           The first unit consists of a vacant anchor unit formerly
                           occupied by Kroger.  This unit is 31,170 square feet and
                           measures approximately 176' x 174'.  This interior finish
                           of this unit has been removed and it is currently
                           undergoing preparation for re-leasing.

                           The next unit is occupied by CVS pharmacy.  It is a
                           large 10,220 square foot unit that measures 73' x 140'

                           The next unit is a Hallmark store.  This unit is 5,600
                           square feet and measures 70' x 80'.

                           Next to the Hallmark store is several small units
                           including Super Nails, The Cleaners, Tropical Tan and
                           one vacant unit.  These units vary from 15' to 20' in
                           width and are 80' in depth.

The next unit is a Glik's apparel store. It is a larger 6,208 square foot unit that measures aproximately 77.5' x 80'.

Next to the Glik's apparel store are four more small units including two vacant units, New York Deli, Radio Shack and Grondins. These units also vary from 15' to 25' in width and are 80' in depth.

The next unit is a typical Kmart store. It is 89,175 square feet and measures approximately 450' x 209.8'. A small portion of the Kmart store was designed as a automotive service center. This space is currently advertised for sub-lease.

Interior finish of the units consists of a mixture of concrete, carpet and quarry tile floors, drywall walls, 2'x4' suspended grid ceilings with fluorescent lighting. Units have individual lavatories and are typical of shopping center units.

Summary:

Condition:              The subject is in average condition for its age.

Inadequacies:           The subject shows some minor signs of deferred maintenance. There are two light fixtures that are broken. One of them is completely missing, except for the base, and the other is toppled over at the base. None of the other light fixtures were obviously broken or damages, but it appears likely that other fixtures of the same age may be nearing the end of their physical life. There are 18 light poles, and most purchasers would consider replacing all of them immediately, since their falling could result in injuries and lawsuits.

                        The subject is located within a short distance from two other shopping centers. One is a brand new high quality shopping center, built in 2002 that shares a lot with a new Kroger store. Across the street from that one is the other local shopping center, which benefits from some recent updates. The subject site has superior visibility to the other shopping centers, which

are perpendicular to the road. However, the subject appears to be in need of updating.

The subject is an anchored shopping center that includes two large and one medium sized anchor units. The largest anchor unit is occupied by Kmart. The other main anchor unit is currently vacant and was formerly a Kroger store. The medium sized unit is occupied by CVS. The Kmart lease will expire in November, 2006, and the CVS lease includes an option to cancel if K-Mart vacates. As a result, the center is approaching a critical juncture. With one major anchor gone, there is some question as to whether the remaining anchors will remain.

The Kmart lease is well below typical commercial rate and is written with 10 5-year options with no increase in rent. This totals 75 years with the same lease rate. Because of the relatively low lease rate, it is likely that Kmart will remain for a significant portion of the option period.

CVS is leased at close to market rates. There is a new Rite Aid Pharmacy on Gratiot, across the street from the new Kroger. Although the added competition is probably not sufficient to merit closing the subject pharmacy, the subject center is probably due for some exterior enhancements to keep the tenant and attract new tenants. With K-Mart being likely to renew its lease, it is likely that CVS will also renew.

Again, the next two years are a critical time for the subject center. If the Kmart and CVS tenants decide to vacate, and with the other anchor unit currently vacant, the loss would likely cripple the shopping center. Although not considered likely, there is some risk associated with this critical juncture. Should both tenants renew their leases, the value of the center is likely to increase significantly. If either anchor tenant decides to vacate, the subject's value is likely to decrease significantly.



















File 407-103

48









File 407-103

