Duffy & Atkins LLP
Todd E. Duffy (TD - 9863)
James E. Atkins (JA - 4922)
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972

Attorneys for Richmond Realty Limited Partnership

| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | |
|---|---|
| ---------------------------------------------------------------x<br><br>In re:<br><br>SCARBOROUGH-ST. JAMES CORP., *et al.*,<br><br>Debtors.<br><br>---------------------------------------------------------------x | Chapter 11<br><br>Case No. 03-17966 (JMP)<br>Case No. 03-17967 (JMP)<br>Case No. 06-12786 (JMP)<br>(Jointly Administered) |

## **DECLARATION OF TODD E. DUFFY**

**TODD E. DUFFY** declares under penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney admitted to practice law in the State and Federal Courts of New York and New Jersey and a member of Duffy & Atkins LLP ("D&A"), counsel to Richmond Realty Limited Partnership ("RRLP").

2. I make this declaration in opposition to the Motion of Scarborough-St. James Corporation ("SSJC") for an Order (1) Enforcing the Adequate Protection Directives Within the Court's April 20, 2007 Amended Order (the "DIP Loan Order") Authorizing Debtor Richmond Realty Limited Partnership to Incur Postpetition Secured Indebtedness; and (2) Requiring RRLP to Reimburse the Estates' Expenses in Bringing this Motion and in support of the Cross-Motion of RRLP to Further Amend the DIP Loan Order to Exclude any Payments to SSJC.

1

3. On or about November 1, 2006, I was approached by Michael Conway, counsel to SSJC, its affiliate, First Richborough Realty Corporation ("FRRC"), and the principal of these entities, Nancy Armano, about representing RRLP in a chapter 11 bankruptcy proceeding. The filing was necessary to prevent an imminent foreclosure of the shopping center that would severely prejudice the creditors of SSJC, FRRC and RLLP. He stated that if my firm were to decide to take on this representation, D&A could not request and would not receive any payment or retainer from RRLP prior to the petition being filed. However, Mr. Conway informed me that he was or eminently would be in negotiations with a lender who was willing to provide debtor-in-possession financing to RRLP following its bankruptcy filing and that once the loan (the "DIP Loan") was funded, there would be more than sufficient funds to pay attorneys fees and the other administrative and operational expenses of the estate.

4. Mr. Conway also explained that although the companies were run by former spouses and that the debtor entities had been adverse to each other, all contentiousness between the debtors was resolved through a settlement agreement approved by the Bankruptcy Court in the SSJC and FRRC bankruptcy cases and that the parties agreed to work together towards the common goal of restructuring RRLP's assets. In fact, he explained, that his plan was to substantively consolidate the three estates and bring them out of bankruptcy not long after the DIP Loan was funded. Based on these representations, I met with the principal of RRLP, Thomas L. Armano, Jr., briefly and my firm decided to take on the representation.

5. RRLP filed its bare-bones voluntary petition on November 22, 2006. During the following four weeks, through the middle of December 2006, I focused on

completing RRLP's filing, i.e., preparing schedules, an affidavit pursuant to Local Rule 1007-3, and all necessary documents to bring the case up to speed. RRLP's schedules were filed on December 15, 2007.

6. On December 7, 2007, I attended a meeting between the principals of SSJC/FRRC and RRLP. This first meeting went smoothly with no conflict. Mr. Conway discussed with me, Thomas L. Armano, Jr. and Nancy Armano substantively consolidating the three estates and filing a joint plan.

7. Throughout the month of December, 2006, Mr. Conway supplied me with hundreds of pages of documents regarding history of the companies, their financial structure, their creditor bodies and numerous documents pertaining to the Armanos' marital dissolution so that I could get the additional information necessary to lead RRLP out of its chapter 11 bankruptcy. During this time, Mr. Conway continued his negotiations with the lender he had identified for the DIP Loan, Madison Realty Capital. Because my client and his clients had agreed, in principle, to substantively consolidate the three estates through a plan of reorganization, I was not especially concerned when Mr. Conway, on February 7, 2007 forwarded me one hundred and twenty-five pages of loan documents relating to an anticipated loan transaction between RRLP and Madison Realty Capital, a company that I had never spoken with before.

8. Shortly after receiving the loan documents, Mr. Conway, the principals of SSJC/FRRC and RRLP, and I met to go over the loan documents and discuss any provisions that we felt were significant or changes that the group believed need to be made. During that meeting, we discussed and resolved how the proceeds from the DIP Loan would be used. The principals also agreed that they should each receive a salary to

compensate them for the time spent operating their respective companies during their bankruptcy cases. The parties never discussed, let alone agreed to, making adequate protection payments to anyone much less to SSJC. Mr. Conway summarized the parties' agreement in an e-mail dated January 4, 2007. A true and correct copy of the January 4, 2007 e-mail from Mr. Conway to me is annexed hereto as Exhibit A.

9. Between January 4, 2007 and January 17, 2007, I was in almost daily contact with Mr. Conway. During these conversations, Mr. Conway continued to speak about the substantive consolidation of the estates. Further, during many of these conversations, Mr. Conway and SSJC's principal Nancy Armano made multiple references to the fact that we were working together towards a common goal.

10. On January 17, 2007, Mr. Conway sent, via e-mail, a draft of the motion to approve the DIP Loan that he prepared in consultation with counsel to the DIP Loan lender. That draft contained nothing about adequate protection payments to anyone, including SSJC. In the spirit of collegiality and working together, the e-mail with the draft motion attached was sent directly to RRLP's principal, SSJC's principal and myself. A true and correct copy of the January 17, 2007 e-mail from Mr. Conway is annexed hereto as Exhibit B.

11. On January 24, 2007 at approximately 7:15 p.m., Mr. Conway sent, via e-mail to all parties, revised DIP Loan motion pleadings. In the text of the e-mail, Mr. Conway described the changes to the papers from the version sent on January 17, 2007 as a modification to the adequate protection issues with regard to Warren Bank and Carmen LLC (the lenders with first priority liens on the property) which he said would satisfy the possible concerns of the Court and force Warren Bank and Carmen to state a concrete

payoff amount for their loans.  He also stated that he planned on filing this version of the motion the following day.  (Though, he ended up not serving and filing it until January 30, 2007.)  No mention was made of payments to SSJC in the e-mail text.  The document was sent as clean document without redlining or other highlighting of changes from the prior version.  A true and correct copy of the January 24, 2007 e-mail and its attachment are annexed hereto as Exhibit C.

12. Based upon the statement in Mr. Conway's e-mail that the motion would be filed the following day, I and the other D&A attorneys believed that we had an extremely limited amount of time to review and comment upon this version of the motion.  Yet, given the limited number of changes noted by Mr. Conway in his message and the number of times that both Mr. Conway and his client stressed that "we were working together", we took Mr. Conway at his word and gave the documents only a cursory review.

13. This was a grave mistake.  Although not mentioned in his e-mail or any of the almost daily previous meetings and discussions, Mr. Conway added a provision to this latest draft of the motion and related order that included a mandatory $450,000 payment to SSJC (the "SSJC Payment").  This insertion, which I believe was intentionally added at the last moment and without notification or consultation, was not found by D&A or RRLP until February 18, 2007, the weekend before the hearing to consider the DIP Loan motion.

14. Mr. Conway, in his declaration filed in support SSJC's motion to compel payment, though, states that during a "telephone conversation which took place on January 26, 2007 . . . [RRLP and I] conceded to the [SSJC] payment provision".  Conway

Decla. ¶ 16. The conversation described in Mr. Conway's declaration, however, never occurred. While my notes reflect that there was a lengthy telephone conversation between all parties on January 26, 2007, the conversation did not focus on the SSJC Payment. Rather, the conversation focused on the structure of adequate protection to Carmen and Warren Bank, but no mention was made by SSJC or Mr. Conway of a $450,000 payment or any "adequate protection" to SSJC. In fact, the majority of the conversation was focused on the pending litigation with the Beeding Legal Group and John Beeding, individually. A true and correct copy of my contemporaneously maintained time records relating to this matter are annexed hereto as Exhibit D.

15. Part of the reason the conversation on the 26th lasted so long was because Mr. Conway and his client, Nancy Armano, wanted to discuss a scheme that they had come up with for RRLP to pay Ms. Armano's personal legal expenses. Here is how the scheme was to work: SSJC would agree to have RRLP pay John Beeding $150,000 to settle Mr. Beeding's claim against the RRLP estate. However, only $75,000 of the payment was actually to go to Mr. Beeding. The other $75,000 was to appear as a payment to Mr. Beeding for purposes of seeking approval from the bankruptcy court and creditors but, once approved, would be redirected from Mr. Beeding to Ms. Armano's personal attorney to whom she owed money. Mr. Armano and I objected to this plan since it involved misrepresenting the settlement and because the payment of Ms. Armano's personal legal bills was a totally improper use of RRLP's estate assets. In response, Mr. Conway and Ms. Armano indicated that they would not support the otherwise advantageous settlement. Annexed hereto as Exhibit E is a true and correct

6

copy an e-mail dated January 9, 2007 between Mr. Conway and Mr. Beeding outlining Mr. Conway's and Ms. Armano's plan.

16. Between the time the motion to approve the DIP Loan was filed and February 18, 2007, I requested on several occasions that Mr. Conway explain in greater detail how he envisioned the proceeds of the DIP Loan were going to be used and requested that he prepare a chart breaking down the categories set forth in his January 9th e-mail. No such chart was ever prepared.

17. Finally, on Sunday, February 18, 2007, as I was preparing for the upcoming DIP Loan hearing and re-reviewing the papers, I discovered the newly added clause relating to the SSJC Payment. I immediately contacted Mr. Conway and asked him how this appeared in this motion without any discussion with RRLP or its counsel. Mr. Conway's response was "I just assumed you read everything I sent you." Mr. Conway never once referenced a lengthy telephone conference on January 26, 2007. Indeed, when I asked Mr. Conway if this had ever been discussed between the parties he simply repeated "I just assumed you read everything I sent you."

18. I then told Mr. Conway that RRLP would object to the form of proposed order if the SSJC Payment provision remained. Mr. Conway informed me that without a payment to SSJC, SSJC would not approve this DIP Loan or any other debtor-in-possession financing for RRLP. He also stated that the main reason he needed this money to come into the SSJC estate was that he had incurred approximately $300,000 in attorneys fees and SSJC had no way of paying them or other administrative claims. In response to this concern and relying on the notion that RRLP's estate would ultimately be consolidated with SSJC's and FRRC's, RRLP agreed to pay the attorneys fees that SSJC

7

incurred after August 9, 2006 – the date of the settlement agreement between the estates. RRLP did not agree to pay SSJC's or FRRC's fees from before that date because those entities were adverse to RRLP prior to that date and RRLP felt very strongly that it and its creditors should not have to pay those fees. Ultimately, this was the agreement of the parties. A true and correct copy of an e-mail exchange between Mr. Conway and myself on February 19, 2007, summarizing and confirming this agreement is annexed hereto as Exhibit F.

19. Pursuant to the fee statements filed with this Court, the total owed to Mr. Conway's two firms for representing SSJC and FRRC since August 9, 2006 is approximately $180,471.34. A true and correct copy of the fee statements for this period are annexed hereto as Exhibit G.

20. My understanding of the deal was corroborated by Mr. Conway's representations to the Court at the February 21, 2007 hearing on the motion. In response to this Court's inquiry, Mr. Conway stated that the financing was required for the adequate protection issues with regard to Warren Bank and Carmen LLC and because, "[w]e need to pay…penalties and attorneys' fees." See pages 3 and 5 of "Part A" of the February 21, 2007 hearing transcript, a true and correct copies of which are annexed hereto as Exhibit H.[1] Moreover, Mr. Conway, again in response to the Court, stated that the financing was not exit financing. See Exhibit H, "Part A" at p. 4. Mr. Conway also confirmed that he envisioned going forward towards a common goal of filing a joint plan of reorganization. See Exhibit H, "Part B" at p. 2.

---

[1] Because of a brief adjournment during the hearing, the transcript contains two parts, distinguished here as "Part A" and "Part B".

8

21. Moreover, Mr. Conway's own representations to this Court at the hearing to approve the DIP Loan belie his assertion that he needs the entire $450,000 to fund a stand alone plan for SSJC:

JUDGE JAMES PECK:

I'm not going to make your day any harder. I will accept the Order in the form that is acceptable to the US Trustee's office and to Carmen's Counsel. The one question I do have relates to the critical path to the end of the bankruptcy case, or cases, and it's a question I know I've asked you in the past, and you've given me good faith answers at the time that have always been wrong, not because you've intentionally given me bad answers, but that circumstances have not allowed you to be right. So what I'd like to know is how and when this case ends, where these cases end.

MICHAEL CONWAY:

Well, subject to Mr. Duffy's comments, I suspect that once we have seen what the claims are in the Richmond Realty case, we will immediately file a joint plan of reorganization, or if it is more appropriate, based on the way things work out, a plan of liquidation where if we have claims that we can't meet we may have to sell the shopping centre as a whole and deal with it that way. But until we see who files a claim I don't know that we can make that final determination. We have a plan of reorganization that's in almost final form waiting for this to happen. As I say, subject to Mr. Duffy's comments, my belief is that we're going to make that determination once we see how much Richmond Realty has to pay out. I don't believe, other than the new amounts we've learned about from Carmen that there is a whole lot out there, but I've been wrong before.

*See* Exhibit H, Part "B" at p.3.

22. Based on the agreement reached on February 18, 2007 and confirmed by e-mail from Mr. Conway on February 19, 2007, the belief that the three debtor estates were ultimately going to be substantively consolidated, and that SSJC would not approve any further financing, I agreed to the deal discussed above. Correctly or incorrectly, I believed that to blow up the deal at that time would have huge ramifications for the solvency of RRLP. RRLP would be forced to begin anew to acquire debtor-in-possession

9

financing, RRLP would be forced to pay a break-up fee to the lender, and RRLP would have been forced to incur additional attorneys' fees to acquire new financing. Given these factors, I believed it was in the best interest of the RRLP's estate and its creditors to move forward and have the DIP financing approved subject to the terms and conditions outlined in the above-referenced February 19th e-mail.

23. Thereafter, on April 24, 2007, during the closing of the DIP Loan, I was surprised by Mr. Conway's demand for payment of the full $450,000 set forth in the DIP Order. Not only was this contrary to our agreement, but would leave RRLP administratively insolvent and without any economic benefit from the DIP Loan. In fact, the DIP Loan transaction cost the RRLP estate approximately $150,000 in attorneys' fees and closing costs.

24. In furtherance of his Motion, and most likely in an effort to discredit me personally – although not directly related to SSJC's or RRLP's motion – Mr. Conway, in his declaration, makes a serious misrepresentation regarding the secreting of alleged SSJC property that impugns my integrity and misleads this Court. I feel compelled to correct the record.

25. Mr. Conway's allegation that RRLP and I conspired to steal rents from SSJC is false and preposterous. Before the closing of the DIP Loan, Mr. Armano told Ms. Armano that he would be sending letters to the tenants asking them to pay the rent to D&A's escrow account as soon as the loan had closed. With regard to the one tenant I contacted directly on behalf of RRLP, I told Mr. Conway *within hours* of faxing the letter to the tenant. Moreover, I sent a copy of the letter to Mr. Conway via e-mail that same day. A true and correct copy of the e-mail message attaching copies of those letters and

informing Mr. Conway of the letter sent to the tenant is annexed hereto as Exhibit I. Mr. Conway did not object at that time or since (until the filing of the motion) to the sending of this letter.

26. Mr. Conway also knows full well that the letter sent by me was done on the same day of the closing of the DIP Loan and that I specifically told Mr. Conway about the letters at the closing. Indeed, I explained that the only reason that we did this was to make certain that we did not lose the rents to Carmen. This was confirmed in the letter sent to Mr. Conway on April 26, 2007 a true and correct copy of which is annexed to Mr. Conway's Declaration dated April 30, 2007 as Exhibit B. Thus, Mr. Conway's allegation regarding "secret" attempts to convert the rents is not only absurd but approaches perjury.

Dated:     New York, New York
           May 4, 2007                         /s/ Todd E. Duffy
                                                   Todd E. Duffy