LeClairRyan, a Professional Corporation
Michael T. Conway, Esq.
830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |
|---|---|
|  | Chapter 11 |
| In re: |  |
|  |  |
| SCARBOROUGH-ST. JAMES CORPORATION, et al., | Case No. 03-17966 (JMP) |
| Debtors. | (Jointly Administered) |

_____

|  |  |
|---|---|
| SCARBOROUGH-ST JAMES CORPORATION, |  |
| Plaintiff, | Adv. Pro. No. _____ (JMP) |
| v. |  |
| MADISON REALTY CAPITAL, L.P.; RICHMOND REALTY LIMITED PARTNERSHIP; and THOMAS L. ARMANO, JR., | **COMPLAINT** |
| Defendants. |  |

_____

Scarborough-St James Corporation ("SSJC"), by its attorneys, allege as its complaint against Madison Realty Capital, L.P. ("Madison"), Richmond Realty Limited Partnership ("RRLP") and Thomas L. Armano, Jr. ("Armano"), as follows:

**Jurisdiction and Venue**

1.       This adversary proceeding arises out of and is related to the above-captioned case pending before the United States Bankruptcy Court for the Southern District of New York. This

Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The causes of action set forth herein concern the administration of the estate and, as such, constitutes a "core" proceeding under 28 U.S.C. 157(b)(2).

2.    Venue of this action in this Court is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

### The Parties

3.    SSJC is a Delaware corporation with its principal place of business in New York, New York.

4.    Madison is, on information and belief, a Delaware limited partnership with its principal place of business in New York, New York.

5.    RRLP is a Michigan limited partnership with its principal place of business in Congers, New York.

6.    Armano is an individual who, on information and belief, resides in Congers, New York.

### Procedural Background

4.    On December 17, 2003 (the "Commencement Date"), SSJC commenced its case, and that of First Richborough Realty Corporation ("FRRC"), under chapter 11 of title 11 of the Bankruptcy Code.

5.    On November 22, 2006, RRLP filed with this Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.    On March 31, 2008, the Court entered and order confirming the Third Amended Joint Plan of Reorganization of SSJC and FRRC (the "Plan").

7.    According to the Plan, FRRC was merged into SSJC on March 31, 2008.

## History of the Shopping Center

8.       In or around August 1985, SSJC acquired the Shopping Center through the creation of two entities: FRRC, a wholly-owned subsidiary of SSJC formed on February 5, 1985, and RRLP, a Michigan limited partnership formed in May 1985.  Thereafter, SSJC and FRRC sponsored a private placement of the 40 ownership units of RRLP.  The placement was underwritten by NASD member firms, during the second, third and fourth quarters of 1985, and the proceeds of this placement were used by SSJC and FRRC to help it acquire the Shopping Center.  In addition to using these proceeds, FRRC assumed an obligation to pay an underlying wrap mortgage in the amount of $4.715 million.

9.       RRLP next acquired the Shopping Center from FRRC on August 1, 1985.  The Shopping Center, which RRLP continues to own, is approximately 158,000 square feet in size and is situated on approximately 19.81 acres of land.  The Shopping Center is anchored by Kmart (89,175 square feet), CVS and Radio Shack.  The shopping center has one major vacancy in a location that was formerly occupied by Kroger supermarket and several small (satellite) store vacancies.

10.      As partial consideration for the sale of the Shopping Center to RRLP, FRRC took back a promissory note secured by a long term, purchase-money wraparound mortgage from RRLP in the original principal amount of $7,830,000 (approximately $8,608,889 as of the RRLP Petition Date), which wrapped around and was inclusive of the all the underlying mortgages on the Shopping Center (this promissory note and wraparound mortgage are collectively referred to herein as the "FRRC Wrap").  Simultaneously with the sale of the Shopping Center by FRRC to RRLP, FRRC leased back the Shopping Center from RRLP and, pursuant to said leaseback, RRLP assigned all of the revenues of the shopping center to FRRC and FRRC assumed the

obligation to pay the Shopping Center's expenses (the "Intermediate Lease"). The interaction of the Intermediate Lease, FRRC Wrap and FRRC's rights and obligations thereunder gave FRRC a substantial income earning capacity and control of the Shopping Center until 2023.

11.     FRRC sold the FRRC Wrap and Intermediate Lease and all of its rights associated therewith in 1985 to MCANY of Richmond Fund Limited Partnership, a New York limited partnership ("MCANY I"). Simultaneously with FRRC selling the FRRC Wrap and Intermediate Lease to MCANY I, FRRC entered into a long term servicing agreement (the "Servicing Agreement") with MCANY I, pursuant to which FRRC administered the Intermediate Lease and serviced the FRRC Wrap on behalf of MCANY I and RRLP. The interaction of the Intermediate Lease, FRRC Wrap and Servicing Agreement preserved the substantial income earning capacity and control of the Shopping Center FRRC derived from its originally having entered into the Intermediate Lease and FRRC Wrap with RRLP. As an administrative matter, MCANY I assigned the Intermediate Lease and the FRRC Wrap to MCANY of Richmond Fund II Limited Partnership, a New York limited partnership ("MCANY II") in approximately 1994.

12.     The current General Partner of RRLP, Armano, was President and sole director of SSJC and FRRC until November 2003. The current President and Chairman of the Board of Directors for SSJC and FRRC, Nancy Armano ("N. Armano"), who at the time (in November 2003) was a minority shareholder of SSJC, learned of a secret settlement negotiated between SSJC and its former local manager, Jacobson-Stewart Richmond Properties Management ("JS") in certain Michigan litigation concerning the Shopping Center.

13.     In an effort to stop the improper transfer of hundreds of thousands of dollars to Armano – money owed by JS to SSJC – through a fabricated payment to RRLP and its counsel, John M. Beeding, Jr. ("Beeding"), N. Armano purchased a sufficient amount of SSJC stock

whereby she gained majority control and then removed Armano from his positions within SSJC and FRRC. Unfortunately, the funds paid by JS under this secret settlement were transferred to Beeding before the stock purchase could be completed.

14.     It was later learned that, almost simultaneously with this stock purchase (which had been telegraphed to Armano by the selling stockholder) Armano, with the assistance of Beeding, also engineered a transfer of the Intermediate Lease away from MCANY II based on a false claim that MCANY II was in default of the terms of the Intermediate Lease; RRLP manufactured a claim that MCANY II had failed to make a required payment of real estate taxes. By virtue of this improper and preferential transfer of the Intermediate Lease and, in turn, the cancellation of the Servicing Agreement, the Debtors were left insolvent and, in an effort to obtain the return of these and other misappropriated assets, the Debtors filed the SSJC/FRRC bankruptcies in December 2003.

15.     After much litigation and intense negotiation, on or about June 26, 2006, RRLP, SSJC, FRRC, MCANY II and certain other parties settled their disputes under the SSJC/FRRC bankruptcies pursuant to a Stipulation Resolving Claims ("Stipulation") and, on August 9, 2006, the Bankruptcy Court approved the Stipulation.  Pursuant to the Stipulation, among other things, a restated Intermediate Lease was entered into between RRLP and MCANY II; all interests of RRLP in the income potential of the Shopping Center and/or the sub-leases at the Shopping Center were assigned to MCANY II; and the Servicing Agreement was reinstated, but modified such that any excess income due to MCANY II under the Intermediate Lease was now to be retained by SSJC, all as compensation for damages sustained by the above-described malfeasance on the part of RRLP and MCANY II.  In addition, MCANY II assigned a portion of

the FRRC Wrap, in the amount of $1,400,000, to SSJC and FRRC ("Assigned Portion"), and it subordinated the balance of the FRRC Wrap to this Assigned Portion.

16.      After entering into the Stipulation, the Debtors attempted to stabilize the ownership and financing with respect to the Shopping Center and took the necessary steps to prevent a foreclosure by the former senior lender to RRLP.  As a result of that 2006 foreclosure proceeding, RRLP filed its own bankruptcy case as set forth above.

17.      SSJC then attempted to negotiate a joint plan of reorganization with RRLP. Ultimately, after negotiations with RRLP stalled, it was determined that, from a financial perspective, it made sense for SSJC and FRRC to take the necessary steps to emerge from bankruptcy through the filing of the Plan.

**The DIP Financing Order**

18.      On February 21, 2007 this Court heard a motion by which approval was sought on a proposed $3.1 million loan to RRLP (the "DIP Loan") and, indeed, the DIP Loan motion was granted by this Court as evidenced by an Order (the "DIP Financing Order") dated February 22, 2007 (later amended on April 20, 2007 at the request of RRLP to accommodate certain concerns of the Lender).

19.      Pursuant to the DIP Financing Order, the Lender was granted a security interest and a superpriority claim secured, *inter alia*, by perfected priming liens on all of RRLP's assets and priming all existing secured creditors, including the secured claims of Warren Bank, SSJC and MCANY II.

20.     Due to a refusal on the part of Armano to execute certain documents required by Madison to extend the term of the DIP Loan (there was an option to extend the loan term for an additional year built into the DIP Financing documents), Madison ultimately foreclosed with a sale date set for September 26, 2008.

21.     The foreclosure sale was adjourned by Madison based on September 24, 2008 agreement with SSJC which allowed SSJC time to engineer a payoff of the amounts due under the DIP Loan on or before October 24, 2008 (the "Agreement").  A copy of the Agreement is annexed hereto as Exhibit "A."

22.     On October 22, 2008, SSJC, by counsel, moved the Court for the entry of an order, pursuant to section 105 of Bankruptcy Code, which enjoins a sheriff's sale by Madison of the Shopping Center, which sale was set to be held by the Macomb County Sheriff on Friday, October 24, 2008 (the "Sale").

23.     The Sale was originally set for September 26, 2008,

**As and for a First Cause of Action – Breach of Contract**

24.     SSJC repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

25.     SSJC has performed all covenants and conditions required of it under the Agreement.

26.     As a showing of good faith, SSJC forwarded the commitment letter from its lender establishing that the funds would be forthcoming to payoff the DIP loan in a transaction whereby Madison would simply assign its rights under the DIP loan documents to a newly formed, special purpose vehicle financing by Paradigm Credit Corp.  (the "Commitment").  The

Commitment was sent in confidence to Madison.  A copy of the Commitment is annexed hereto as Exhibit "B."

27.     Madison delivered the Agreement and the Commitment to Armano, who had met with Madison earlier and had indicated his desire that the Shopping Center be sold at foreclosure so that he and RRLP could simply repurchase it through a redemption and wipe out the other lien holders, including SSJC.

28.     When Armano obtained the Agreement and Commitment from Madison, he proceeded to send a letter to Paradigm, and others, threatening litigation if Paradigm followed through with its financing of the purchase of the DIP loan.  A copy of Armano's letter is annexed hereto as Exhibit "C."

29.     Madison breached the covenant of good faith and fair dealing implied in the Agreement by providing the Agreement and Commitment to Armano in that this communication with Armano by Madison was made knowing he would interfere with the financing commitment from Paradigm.

30.     Paradigm refused to close based on Armano's letter absent a declaration from the Court declaring that the DIP loan was assignable pursuant to its terms under the DIP loan documents and related Order of this Court approving the DIP loan.

31.     SSJC has no adequate remedy at law as a consequence of the breach by Madison.

32.     SSJC will suffer irreparable harm which would occur if the Sale were to take place.

33.     As a consequence of the breach by Madison, SSJC is entitled to an order enjoining the Sale.

**As and for a Second Cause of Action - Declaratory Judgment**

34.     SSJC repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

35.     Armano's letter (Exhibit "C" hereto) puts the right of Madison to assign is rights under the DIP Loan and the DIP Financing Order to Paradigm into question and threatens litigation should this assignment take place.

36.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure, 15 U.S.C.A. § 1121 and 28 U.S.C. §§ 2201 and 2202, there is a justiciable controversy between the parties concerning the validity, enforceability and scope of the assignment provision in the DIP Financing Order.

37.     A copy of the DIP Financing Order is annexed hereto as Exhibit "D."

38.     SSJC is entitled to a declaration from the Court that the assignment provision in the DIP Financing Order allows for Madison to assign its rights under the DIP Loan and DIP Financing Order to a third party, including without limitation, Paradigm.

WHEREFORE, SSJC demands judgment against defendants as follows:

A.      On the First Cause of Action, an injunction enjoins a sheriff's sale by Madison of the Shopping Center;

B.      On the Second Cause of Action, declaring that the assignment provision in the DIP Financing Order allows for Madison to assign its rights under the DIP Loan and DIP Financing Order to a third party, including without limitation, Paradigm; and

C.      Awarding SSJC its costs and disbursements of this action including reasonable attorneys' fees if recoverable by law and such other and further relief that the Court deems just and proper.

Dated: New York, New York
October 23, 2008

LeCLAIRRYAN, a Professional Corporation

By: /s/ Michael T. Conway
Michael T. Conway
830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation

**Exhibit A**

# AGREEMENT

This Agreement ("Agreement"), effective September 24, 2008, is entered into by and between Madison Realty Capital, L.P. ("Madison Realty"), and Scarborough-St. James Corporation, for itself and as successor by merger of and with First Richborough Realty Corporation (collectively, "SSJC") and Nancy P. Armano ("Armano").

## RECITALS:

a.     On April 25, 2007, Richmond Realty Limited Partnership, a Michigan limited partnership ("RRLP") granted a mortgage to Madison Realty, which was recorded on May 14, 2007 in Liber 18700, Page 317, Macomb County Records, Michigan ("Mortgage").

b.     The Mortgage pertains to the property located at 67300-67500 Main Street, Richmond, Michigan, Parcel Identification Nos. 06-01-426-026, 06-01-426-027 and 06-01-426-028 (collectively, the "Premises").

c.     Due to existing and continuing defaults under the Mortgage ("Defaults"), Madison Realty initiated foreclosure proceedings against the Premises in the State of Michigan through foreclosure by advertisement ("Foreclosure") by publication in the Macomb County Legal News ("Publication").

d.     The Publication was posted on the Premises as required by Michigan statute by the Macomb County Sheriff.

e.     The Sheriff's Sale of the Premises pursuant to the Foreclosure ("Sheriff's Sale") is scheduled for Friday, September 26, 2008 (the "Sale Date").

f.     Due to the Defaults, Madison Realty also recorded with the Macomb County Register of Deeds a Notice of Default of Mortgage on August 26, 2008 in Liber 19466, Page 189 ("Notice of Default") and served a copy of the Notice of Default and the Collateral Assignment of Leases and Rents dated April 25, 2007 and recorded on May 14, 2007 in Liber 18700, Page 349, Macomb County Register Deeds, to all tenants of the Premises requiring them to immediately remit all rents, issues and profits due under any leases or rental agreements directly to Madison Realty ("Notice of Assignment of Rents").

g.     SSJC or Armano, on behalf of themselves or an affiliated entity formed or to be formed by SSJC or Armano, have expressed a desire to purchase the Mortgage, the underlying note and all related loan and security documents pertaining to the Premises (collectively, the "Loan Documents") from Madison Realty.

h.     SSJC and Armano need additional time to put the financing package together and prepare an offer to Madison Realty, and have requested that Madison Realty adjourn the Sale Date of the Sheriff's Sale to obtain the requisite financing and prepare the necessary documents.

For good and valuable consideration, which is acknowledged and agreed to, the parties agree as follows:

1. <u>Recitals</u>. The Recitals are incorporated herein as agreements of the parties.

2. <u>Notice</u>. SSJC and Armano have notice of the (a) Foreclosure, (b) Publication, (c) Notice of Default, (d) Notice of Assignment of Rents, (e) Sheriff's Sale, and (f) Sale Date.

3. <u>Sale of Loan Documents/No Representations or Warranties</u>.

(a) Prior to any Sheriff's Sale, Madison Realty will consider, but shall not be obligated to, sell the Loan Documents to SSJC, Armano or an affiliated entity formed or to be formed by SSJC or Armano, pursuant to an executed definitive and binding agreement for an agreed upon purchase price. SSJC and Armano understand and agree that the purchase price required to purchase the Loan Documents from Madison Realty shall be the sum of $3,298,780.02 which is the payoff amount as of September 23, 2008, plus accrued interest at the default rate under the Loan Documents of twenty-four (24%) percent per annum from and after September 23, 2008 which is $2,066.67 per day, less any payments received by Madison Realty under the Loan Documents, until the closing on the sale of the Loan Documents. Until such time, if at all, a definitive and binding agreement between Madison Realty and SSJC, Armano or an affiliated entity formed or to be formed by SSJC or Armano, is entered into for the sale of the Loan Documents, Madison Realty is free to negotiate and sell the Loan Documents to any other third party or entity without violating the language contained in this paragraph 3.

(b) SSJC and Armano, on behalf of themselves and any entity formed or to be formed by SSJC or Armano to purchase the Loan Documents, agree that any purchase of the Loan Documents would be "WITHOUT RECOURSE", and without any representations or warranties from Madison Realty and its agents, representatives, employees and attorneys of any kind or nature whatsoever concerning any matter, thing or issue relating to the Loan Documents, and Madison Realty hereby expressly disclaims and makes no representations or warranties with respect to same. SSJC and Armano, on behalf of themselves and any entity formed or to be formed by SSJC or Armano to purchase the Loan Documents, acknowledge and agree that any purchase of the Loan Documents is and will be based on their own independent analysis, investigation and inspection.

4. <u>Adjournment</u>. Madison Realty agrees to adjourn the Sale Date of the Sheriff's Sale for a period of four (4) weeks to Friday, October 24, 2008 (the "Adjourned Sale Date"). Madison Realty will contact the Macomb County Sheriff and/or its designated agent or representative, and adjourn the Sale Date to the Adjourned Sale Date.

5. <u>Waiver and Release</u>. In consideration of and for this Agreement, and the adjournment of the Sale Date of the Sheriff's Sale to the Adjourned Sale Date, each of SSJC and Armano, on behalf of themselves, and each of their respective subsidiaries, officers, directors, shareholders, agents, employees, attorneys, affiliates, predecessors, successors, representatives and assigns, hereby fully, finally, unconditionally and irrevocably waives and releases, any and all claims, defenses, counterclaims, actions, causes of action, allegations, assertions, rights, rights to bring, seek, initiate or proceed with obtaining a temporary restraining order, preliminary

injunction, permanent injunction or any other injunctive relief which enjoins or otherwise restrains the Foreclosure, the Sheriff's Sale, the Sale Date and/or the Adjourned Sales Date from occurring, taking place or happening, challenges, disputes, demands, damages, losses, costs, expenses, fees, attorney's fees and any other sums or amounts whatsoever, at law or in equity, of whatever kind or character, which SSJC and Armano, or any one or more of them, had, now has or may in the future have, whether generally, and/or against Madison Realty and its officers, directors, partners, agents, employees, attorneys, affiliates, successors, representatives and assigns (collectively, the "Madison Realty Releasees"), arising from, relating to or in connection with in any way to (a) the Defaults broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (b) the Foreclosure broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts, publication, lack of publication, deficient publication, improper publication and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (c) the Publication broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts, posting, non-posting and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (d) the Notice of Default broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts, posting, non-posting, recording, non-recording, deficiency in recording, improper recording and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (e) the Notice of Assignment of Rents broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts, posting, non-posting, recording, non-recording, deficiency in recording, improper recording and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (f) the Sheriff's Sale broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts and non-compliance with applicable rules, laws, statutes or Loan Documents, and (e) the Sale Date and the Adjourned Sale Date broadly construed, including, without limitation, any notice, lack of notice, deficiency of notice, service, failure of service, improper service, deficiency in service, procedural defects, cure, opportunity to cure, time period to cure, cure amounts and non-compliance with applicable rules, laws, statutes or Loan Documents with respect thereto, and (g) the accrual of the indebtedness under the Loan Documents at the default interest rate of twenty-four (24%) percent per annum from and after April 24, 2008 and during and throughout any redemption period relating to the Premises (wherein SSJC and Armano specifically acknowledge, agree and understand that such indebtedness is and will continue to accrue at the default interest rate of twenty-four (24%) percent per annum from and after April 24, 2008 and during and throughout any redemption period relating to the Premises), and (h) any and all other pre- and post-Foreclosure, Publication and/or Sheriff's Sale items, claims, counterclaims, rights, matters, things and issues whatsoever

broadly construed as they relate to the Loan Documents and/or the remedies and procedures exercised by the Madison Realty Releasees thereunder, including, without limitation, relating to any procedure, action or non-action taken, not taken or to be taken by the Madison Realty Releasees relating to the Loan Documents, the Premises, the Foreclosure, the Publication, the Notice of Default, the Notice of Assignment of Rents, the Sheriff's Sale, the Sale Date and/or the Adjourned Sale Date. Notwithstanding anything contained herein to the contrary, to the extent the Sheriff's Sale takes place, neither SSJC nor Armano are waiving or releasing their redemption rights, if any, relating to the Premises. Each of SSJC and Armano represent and warrant that they have not assigned, transferred or otherwise conveyed any of the broadly construed matters waived and released herein.

6. <u>Cash Deposit</u>. In consideration of and for this Agreement, and the adjournment of the Sale Date of the Sheriff's Sale to the Adjourned Sale Date, concurrent with the execution of this Agreement, SSJC or Armano shall wire or cause to be wired the sum of $10,000.00 ("Deposit") to Erman, Teicher, Miller, Zucker & Freedman, P.C. (the "Escrow Agent") who shall hold the Deposit in accordance with this paragraph 6. In the event that Madison Realty and SSJC, Armano or an affiliated entity formed or to be formed by SSJC or Armano are unable to close on the sale of the Loan Documents prior to any Sheriff's Sale for any reason whatsoever and regardless of fault, the Deposit shall be released by Escrow Agent to Madison Realty and applied by Madison Realty against the indebtedness owing to it under the Loan Documents; otherwise, the Deposit shall be released by Escrow Agent to Madison Realty at any such closing with SSJC, Armano or an affiliated entity formed or to be formed by SSJC or Armano, and applied by Madison Realty as a credit against the purchase price for the Loan Documents. All parties to this Agreement acknowledge and agree that Escrow Agent is counsel for Madison Realty in this transaction, consent to this escrow arrangement, and waive any and all actual, apparent or potential conflicts of interest in Escrow Agent acting in such capacity under this Agreement. Escrow Agent shall not be liable, and is indemnified and held harmless by each of the parties to this Agreement, jointly and severally, for any act or omission while acting in good faith and in the exercise of its own best judgment, absent willful misconduct or gross negligence. In performing its obligations hereunder, Escrow Agent shall be entitled to presume, without inquiry, the due execution, validity and effectiveness of all documents it receives, and also the truth and accuracy of any information contained therein.

7. <u>Miscellaneous</u>. Counterpart signatures are permitted and when taken together shall constitute one agreement. Facsimile or e-mail signatures shall be treated as original signatures for all purposes.

This Agreement is executed effective the date and year above written.

"Madison Realty"

By: _Eric Scheffler_

Print Name: _____

Its: _Managing Member_

[signatures continued on page 5]

4

[signatures continued from page 4]

"SSJC"

Scarborough - St. James Corporation
By: _Nancy P. Armano_
Print Name: _Nancy P. Armano_
Its: _President_

"Armano"

_Nancy P. Armano_
Nancy P. Armano

24 Sept. 2008

F:business\madison realty\richmond realty\letter agreement 092408 v.4 FINAL EXECUTION VERSION

**Exhibit B**



**P A R A D I G M**
Capital Group

September 16, 2008

Ms. Nancy P. Armano
C/o Mr. Michael T. Conway
Leclair Ryan
830 Third Avenue, Fifth Floor
New York, NY 10022

RE: PROPOSED LOAN FOR RICHMOND SHOPPING CENTER 67300-67500 MAIN STREET, RICHMOND, MI

Dear Ms. Armano,

Based on our review of the information provided to date, Paradigm Capital Funding LLC, or an affiliate thereof, will consider making a loan to Borrower(s). This term sheet represents a commitment on the part of Paradigm Capital Funding LLC to make the Proposed Loan subject to the following terms and conditions:

| | |
|---|---|
| **Borrower:** | A single purpose entity to be formed |
| **Lender:** | Paradigm Credit Corp., a New York limited liability company, and/or an affiliate thereof. |
| **Subject Property(s):** | Richmond Shopping Center<br>67300-67500 Main Street<br>Richmond, Michigan<br>(155,685/ sq. ft. retail shopping center) |
| **Proposed Loan Amount:** | Three Million Eight Hundred Thousand Dollars ($3,800,000.00) |
| **Use of Proceeds of Loan:** | Proceeds to be used to pay off existing debt, interest reserve and closing costs associated with the loan, with any remaining balance to be allocated 50% to an escrow account to be used for improvements to the subject property and the remaining amount for borrower's professional fees. |
| **Term:** | Twelve (12) Months from the date of closing. |
| **Amortization:** | Interest Only |
| **Interest Rate:** | |
| **Origination Fee:** | |
| **Exit Fee:** | |
| **Prepayment:** | The Loan is pre-payable in full at anytime subject to a minimum of three (3) months of interest earned. |

1



**P** A R A D I G M
Capital Group

| | |
|---|---|
| **Loan Assumption:** | The Proposed Loan shall be due and payable in full upon any transfer or sale of the Property or any ownership interest in Borrower. |
| **Security:** | The Proposed Loan shall be secured by (i) a first priority mortgage on property(s), (ii) an assignment of and security interest in all current and future leases related to the property(s) and (iii) UCC-1Liens on all personal property, equipment and fixtures and (iv) Collateral Assignment of Borrowers rights to the cash flow and (v) an assignment of interests in borrowing entity. |
| **Commitment Fee:** | A certified check in the amount of Twenty Thousand Dollars ($20,000.00) made payable to Paradigm Capital Funding, LLC. shall be delivered simultaneously with the submission of this commitment in order to cover all underwriting expenses, including a non-refundable processing fee of $3,500 and any other expenses incurred by Lender while conducting due diligence. If, after Borrower has satisfied all conditions precedent to the closing of the proposed loan, Lender fails to provide the Proposed Loan to Borrower, Lender shall return the commitment fee to Borrower (less processing fee and any such costs and expenses incurred by Lender). If all terms and conditions are met (or Lender elects, in its sole discretion, to waive any such terms and conditions) then at the closing, Lender shall contribute the Commitment Fee toward closing costs (less the processing fee and any such costs and expenses incurred by Lender), or in the event a closing does not occur, the Commitment Fee shall be non-refundable. |
| **Legal Fees:** | The interests of the Borrower and Lender are or may be different and may conflict, and the Lender's attorney solely represents the interest of the Lender. It is advised and requested that the Borrower employs an attorney of it's own discretion, to represent the interests of the borrower. |
| | The Borrower shall be required to pay to the Lender's attorney, Stacy G. Rom-Jensen, the reasonable legal fees and expenses of Lender's attorney for services provided to Lender in connection with this transaction. The legal fees of Lender's attorney shall be calculated on a time-spent basis, based upon the standard hourly rates of Lender's attorney generally charged to clients of that firm for similar matters. Lender estimates, in good faith, that the legal fee of Lender's attorney which borrower will be required to pay hereunder will be no greater than Twenty Thousand Dollars ($20,000.00) of which shall be actual and reasonable, to be paid at closing. Borrower is also responsible for any legal fees of local counsel required by Lender. |
| **Lock Box:** | Lender shall have the option, exercisable in its sole and absolute discretion, to require that all income from the Property be deposited by all tenants of the Property directly into an interest bearing account which shall be controlled by Lender (the "Lock Box Account"). Lender shall use the funds in the Lock Box Account only for payment of (a) all sums due under the Loan Documents, including, without limitation, the Monthly Payment and any and all applicable reserves, in such order and priority as Lender shall determine, and (b) Lender-approved operating expenses. |

2



| | |
|---|---|
| **Guaranty:** | Ms. Nancy P. Armano and all principals shall execute a guaranty (the "Guaranty"), under which such entity(s) shall, jointly and severally, guaranty payment of all principal, interest and other amounts due with respect to the Proposed Loan. |
| **Environmental Report:** | Borrower shall provide Lender, at Borrower's sole cost and expense, prior to the closing of the Proposed Loan, a *Phase One Environmental Report* for the property(s) and *Phase Two Environmental Report* if needed, performed by an environmental firm acceptable to Lender in its sole discretion. Such Report shall be in form and substance satisfactory to Lender in its sole discretion. |
| **Engineering Report:** | Borrower shall provide Lender, at Borrower's sole cost and expense, prior to closing of the Proposed Loan, a completed Engineering Report for the property(s), performed by a third party Engineer acceptable to Lender in its sole discretion. |
| **Appraisal:** | Borrower shall provide Lender, at Borrower's sole cost and expense, prior to closing of the Proposed Loan, a completed appraisal for the property(s) performed by a third party certified MAI appraiser acceptable to Lender in its sole discretion. Such Report shall be in form and substance satisfactory to Lender in its sole discretion. This transaction is subject to the subject property having an appraised "as is" value of no less than Six Million Dollars ($6,000,000.00) |
| **Insurance:** | Borrower shall maintain at all times, at Borrower's sole cost and expense, paid-up policies of liability, property damage, casualty, rent loss insurance and all other insurance that may be required by Lender under the Loan Documents. All insurance shall be maintained with responsible and reputable insurance companies or associations satisfactory in all respects to Lender. Each policy of insurance shall name Lender as additional insured or loss payee and shall include mandatory 30-day written notice to Lender of any modification or cancellation to any such policies. |
| **Escrow Account:** | Borrower shall establish with Lender a Tax Escrow Account into which Lender shall deposit on the first day of every month, 1/12 of the annual amount due for all real property taxes and assessments payable with the respect to the property, if applicable. |
| **Single Purpose Entity:** | At all times during the term of the Proposed Loan, Borrower shall remain a "bankruptcy-remote" "single-purpose entity", which requirement shall mean that Borrower (i) shall not engage in any business other than the ownership, management and operation of the Property, (ii) shall not own or hold any assets other than the property, (iii) not enter into or incur any secured or unsecured financing (except for the Proposed Loan), (iv) not guaranty or be liable for or in connection with any obligation of any other person or entity, (v) not pledge its assets for the benefit of any other person or entity and (vi) shall comply with all other similar terms and conditions set forth in the Loan Documents. |
| **Additional Financing:** | At all times during the term of the Proposed Loan, Borrower shall not enter into or incur any secured or unsecured financing on the subject property other than the Proposed Loan. No corporate general partner of Borrower may incur any secured or unsecured financing or issue any new or additional stock or other equity interest in such general partner or permit the sale, transfer, pledge or encumbrance of any such stock or other equity interest in such corporate general partner. |

3



**Additional Encumbrances:** At all times during the term of the Proposed Loan (i) Borrower shall not further encumber the Property, and (ii) no partner or other owner of a partnership or other ownership interest in Borrower shall pledge, assign or otherwise transfer its partnership or other ownership interest in Borrower.

**Loan Documents:** All agreements, certificates and documents executed in connection with the Proposed Loan (the "<u>Loan Documents</u>") shall be prepared by counsel designated by Lender and shall be on such forms and contain such terms and provisions as shall be required by Lender in its sole discretion. The Loan Documents shall include, without limitation, the following: (i) a loan agreement; (ii) a promissory note; (iii) a mortgage and security agreement encumbering the Property; (iv) an assignment of leases and rents encumbering the property; (v) Uniform Commercial Code financing statements; (vi) the Guaranty; (vii) an estoppel certificate from each tenant of the Subject Property in form and substance acceptable to Lender; (viii) opinions of counsel, in such form and content as Lender may require; (ix) such other assignments, escrow agreements, certificates, and other documents as Lender may require in its sole discretion to evidence or secure the Proposed Loan.

**Organizational Documents:** Borrower shall provide Lender all corporate, partnership or membership resolutions, certificates of incumbency, certificates of good standing, shareholder consents, certified copies of partnership agreements, operating agreements, articles of incorporation, bylaws, and such other organizational documents and evidence of authority and consent as Lender may require. All such documents and certificates shall be satisfactory to Lender in its sole discretion.

**Title Insurance:** Lender shall order at Borrower's sole cost and expense, one or more policies of mortgagee's title insurance, or "marked-up" binding commitments for mortgagee's title insurance, from a title insurance company, and on an ALTA form of title policy, acceptable to Lender in its sole discretion. Each such policy or commitment shall (i) name Lender and such other parties as may be designated by Lender as the insured parties, (ii) be in the final amount of the Proposed Loan, (iii) insure that the lien of each mortgage and security agreement is a first priority lien on the Property subject only to (a) real estate taxes not yet due and payable and (b) covenants, conditions, restrictions, rights of way and easements acceptable to Lender, (iv) insure that the Property has direct pedestrian and vehicular access to a publicly dedicated, constructed road, (v) contain such endorsements and affirmative coverage as may be required by Lender, and (vi) in any event be in all respects acceptable to Lender in its sole discretion.

**Survey:** Borrower shall provide Lender, at Borrower's sole cost and expense, a current as-built survey of the Property certified to Lender, the title insurer and such other parties as may be designated by Lender. The survey shall be prepared in accordance with current ALTA/ACSM Standards for an Urban Survey and include all items listed in Table A of such Standards, shall contain such certifications as may be required by Lender, and in any event be in all respects acceptable to Lender in its sole discretion.

**Property Status:** Borrower shall provide Lender at the times required under the Loan Documents, at Borrower's sole cost and expense, (i) a current certificate of occupancy for the Subject Property, (ii) permits, licenses or other evidence satisfactory to Lender

4



demonstrating compliance with current zoning, building, health, environmental and other rules, regulations, ordinances and laws applicable to the Property and the use thereof and all covenants and restrictions applicable to the Property, (iii) evidence satisfactory to Lender that (a) public utilities are available and serve the Property with sufficient capacity and (b) the Property has direct pedestrian and vehicular access to a publicly dedicated, construed road.

**Anticipated Closing:**    As soon as possible.

**Underwriting Condition:** Lender will investigate and confirm Property's value ("as is"), inclusive of any existing tenants and tenants which leases will be executed on or before anticipated closing of loan. Such value, capitalization and committed improvements shall be satisfactory to Lender in its sole discretion, including, but not limited to;

1. Site inspection by an officer of Paradigm Capital Funding, LLC.
2. All Corporate, financial, property or other relevant information requested by Lender.

**Commitment Expiration:**    In the event the Borrower is unable to close on or before October 16, 2008 this commitment shall expire.

Your signature below authorizes lender to check and verify credit and employment history and to gather whatever financial information is considered necessary for this evaluation, including, but not limited to, contacting credit reporting agencies and verifying contracts with banks, suppliers, bonding companies, and other financial institutions. Your signature below also authorizes these banks or other financial institutions to communicate with Paradigm Capital Funding, LLC. (1) regarding my/our relationship with them and (2) to verify balances in accounts held by me, and will hold you harmless from any and all actions as a result of this communication.

Upon execution of this term sheet, Borrower acknowledges that it is working solely with Paradigm Capital Funding, LLC. to procure financing for the property. Please acknowledge your acceptance of the terms and conditions relating to the Proposed Loan described herein by executing the acknowledgment below and enclosing the Commitment Fee. By your signature below, you agree to facilitate and assist Paradigm Capital Funding, LLC. in its continued due diligence for the purpose of proceeding in good faith towards the financing. If Paradigm Capital Funding, LLC has received an executed copy of this letter, on or before September 22, 2008, Paradigm Capital Funding, LLC will continue to perform its due diligence.

Paradigm Capital Funding LLC willingness to proceed on the basis of the terms herein terminates at the close of business on September 22, 2008.

Sincerely,
PARADIGM CAPITAL FUNDING LLC

By: _____
David M. Kushner, Managing Member

**COMMITTED AND ACCEPTED TO:**
Ms. Nancy P. Armano


By: _____          _____
Ms. Nancy P. Armano                          Date



demonstrating compliance with current zoning, building, health, environmental and other rules, regulations, ordinances and laws applicable to the Property and the use thereof and all covenants and restrictions applicable to the Property, (iii) evidence satisfactory to Lender that (a) public utilities are available and serve the Property with sufficient capacity and (b) the Property has direct pedestrian and vehicular access to a publicly dedicated, construed road.

**Anticipated Closing:**     As soon as possible.

**Underwriting Condition:** Lender will investigate and confirm Property's value ("as is"), inclusive of any existing tenants and tenants which leases will be executed on or before anticipated closing of loan. Such value, capitalization and committed improvements shall be satisfactory to Lender in its sole discretion, including, but not limited to;

1. Site inspection by an officer of Paradigm Capital Funding, LLC.
2. All Corporate, financial, property or other relevant information requested by Lender.

**Commitment Expiration:**     In the event the Borrower is unable to close on or before October 16, 2008 this commitment shall expire.

Your signature below authorizes lender to check and verify credit and employment history and to gather whatever financial information is considered necessary for this evaluation, including, but not limited to, contacting credit reporting agencies and verifying contracts with banks, suppliers, bonding companies, and other financial institutions. Your signature below also authorizes these banks or other financial institutions to communicate with Paradigm Capital Funding, LLC. (1) regarding my/our relationship with them and (2) to verify balances in accounts held by me, and will hold you harmless from any and all actions as a result of this communication.

Upon execution of this term sheet, Borrower acknowledges that it is working solely with Paradigm Capital Funding, LLC. to procure financing for the property. Please acknowledge your acceptance of the terms and conditions relating to the Proposed Loan described herein by executing the acknowledgment below and enclosing the Commitment Fee. By your signature below, you agree to facilitate and assist Paradigm Capital Funding, LLC. in its continued due diligence for the purpose of proceeding in good faith towards the financing. If Paradigm Capital Funding, LLC has received an executed copy of this letter, on or before September 22, 2008, Paradigm Capital Funding, LLC will continue to perform its due diligence.

Paradigm Capital Funding LLC willingness to proceed on the basis of the terms herein terminates at the close of business on September 22, 2008.

Sincerely,
PARADIGM CAPITAL FUNDING LLC

By: _____
David M. Kushner, Managing Member

**COMMITTED AND ACCEPTED TO:**
Ms. Nancy F. Armano

By: _____          16 Sept. 2008
Ms. Nancy F. Armano                       Date

5

**Exhibit C**



## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: *Mike Conway* | FROM: Adam S. Glick |
| COMPANY: | DATE: |
| FAX NUMBER: 212.430.8062 | TOTAL NO. OF PAGES INCLUDING COVER: |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY     ☐ PLEASE RECYCLE

NOTES/COMMENTS:

### RICHMOND REALTY LIMITED PARTNERSHIP
192 Massachusetts Avenue
Suite 2A
Congers, New York 10920
(845) 268 0409  (845) 558 2768
Fax (845) 267 8495

# FAX COVER PAGE

| | | | |
|---|---|---|---|
| **To:** | David Kushner | **From:** | Thomas L. Armano, Jr. |
| **Fax:** | 212.867.2616 | **Phone:** | 845.268.0409 |
| **Re:** | Paradigm Loan/Nancy Armano | **Fax :** | 845.268.0409 |
| **Date:** | October 10, 2008 | **Pages:** | 7, including cover page. |

Dear Mr. Kushner,

Faxed, herewith, is a letter that I am also sending, via certified mail and as an email attachment, regarding Madison Realty Capital's loan to Richmond Realty, a limited partnership of which I am the managing general partner, and Paradigm Capital Group's loan to Nancy Armano, the purpose of which I understand is for Nancy to either purchase, or payoff Madison's loan to Richmond Realty. I am, of course, open to participating in any process that resolves the issues I have raised in the faxed letter quickly, cost effectively and to the satisfaction of everyone involved.

Thomas Armano

## Thomas L. Armano, Jr.
192 Massachusetts Avenue
Congers, New York 10920
(845) 268 0409  Fax (845) 268 0409
Email: dkanewyork@yahoo.com

October 10, 2008                              Sent Via Facsimile, Email, and Certified Mail

Eric Sheffler, Esq.
General Counsel
Madison Realty Capital, L P.
845 Third Avenue, 37th Floor
New York, N Y  10022

David Kushner
Paradigm Capital Group
380 Lexington Avenue
Suite 2020
New York, N Y  10168

Gentlemen

As Mr. Sheffler is aware, I am the managing general partner of Richmond Realty
Limited Partnership ("RRLP"), a Michigan limited partnership that owns a shopping
center, anchored by Kmart that is located in Richmond, Macomb County, Michigan
("Shopping Center" or "Property"). RRLP filed for bankruptcy protection under Chapter
11 of the United States Bankruptcy Code in the United States Bankruptcy Court,
Southern District of New York ("Bankruptcy Court"), in November of 2006. RRLP's
bankruptcy status remains the same, today. I am also the manager of TYR Limited,
L.L.C., a Michigan limited liability company ("TYR"), which is a 49.25% shareholder of
Scarborough-St. James Corporation ("SSJC").

Madison Realty Capital, L.P. ("Madison"), holds a first mortgage ("Mortgage")
that secures a note in the original principal amount of $3,100,000 ("Note"), pursuant to a
loan that Madison made to RRLP in April of 2007 (I shall refer to the Mortgage, Note
and related loan documents, herein, collectively, as the "Madison Loan."). The Madison
Loan was approved, pursuant to an order of the Bankruptcy Court on April 20, 2007
("Order"). It is RRLP's understanding that Madison recently undertook a Foreclosure by
Advertisement in Michigan, pursuant to which the Shopping Center was supposed to
have been auctioned off on September 26, 2008

It has been brought to my attention that Paradigm Capital Group ("Paradigm"), has
issued a contingent commitment to Nancy Armano, the president, chief executive officer
and chairman of the board of directors of SSJC, pursuant to which an affiliate of
Paradigm would lend Nancy Armano, or an affiliated, to be formed entity $3,800,000, the

Letter to Madison and Paradigm
Page 2, October 10, 2008

proceeds of which would be used by Nancy Armano to pay off the Madison Loan, an interest reserve and closing costs associated with the Paradigm Loan, with any remaining balance to be allocated to be used for improvements to the subject property and the remaining amount for the borrower's professional fees ("Paradigm Loan"). It is my understanding that, while the Paradigm commitment states that the proceeds of the Paradigm Loan will be used to pay off existing debt, that the bulk of said proceeds may, in fact, be used by Nancy Armano or a related entity to purchase the Madison Loan.

I believe it would be in Madison's, Paradigm's, SSJC's and RRLP's best interests to make you aware of certain issues and concerns that RRLP and TYR have pertaining to the Madison Loan and Paradigm Loan, to wit:

1. RRLP has been advised that, ultimately, exclusive jurisdiction over any action, suit, or proceeding by any person arising from or relating to the Note or the Mortgage shall remain with the Bankruptcy Court, as expressly provided in the Note, (as set forth in the next to last paragraph on page 6 of said note), Mortgage, (as set forth in the second paragraph of Section 40 on page 24 of said mortgage) and Order, as set forth in paragraph 17(b) on page 15 of said order). RRLP has been further advised that this is the case despite the fact that certain clauses in the Note and Mortgage regarding default remedies that may be available to Madison and jurisdiction and venue pertaining, thereto, may appear to be to the contrary.

RRLP has been further advised that, per Paragraph 23 of the Order, even in the event RRLP's bankruptcy case were to be dismissed, the Bankruptcy Court "shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Superpriority Claims of the Lender, as the case may be."

RRLP has been further advised that since, as evidenced by the Note, Mortgage and Order, exclusive jurisdiction over any action, suit, or proceeding by any person arising from or relating to the Note or the Mortgage shall remain with the Bankruptcy Court, Foreclosure by Advertisement in Michigan is not available as a default remedy to Madison and, or its successor(s) in the Madison Loan, e.g., Paradigm.

RRLP has been additionally informed that any action, suit, or proceeding by any person arising from or relating to the Note or the Mortgage and for purposes of enforcing the liens, security interests and Superpriority Claims that Madison may possess, must be brought in the Bankruptcy Court by Madison and its successor(s).

2. RRLP has been advised that, if Paradigm were to finance a purchase of the Madison Loan by Nancy Armano or a related entity, Paradigm would not be entitled to a first lien on the Property, or to prime the existing, secured creditors, including but not limited to Carmen, L.L.C., SSJC and MCANY for an amount in excess of the lawful amount RRLP owes Madison under the Madison Loan, which, per Madison's legal notice

Letter to Madison and Paradigm
Page 3, October 10, 2008

in the Macomb County Legal News issued in support of said foreclosure ("Legal
Notice"), Madison purports to be $3,493,735.99, plus accrued interest thereon at 24% per
annum ("Madison Debt"). RRLP has been advised that this would be the case no matter
what the amount that Paradigm may loan in excess of the purported Madison Debt may
be used for, including, but not limited to establishing an interest reserve and closing costs
associated with the Paradigm Loan, with any remaining balance to be allocated to be used
for improvements to the subject property and the remaining amount for the borrower's
professional fees.

3. RRLP has been advised that, if Paradigm were to finance a purchase of the
Madison Loan by Nancy Armano or a related entity, in order for Paradigm to prime the
existing secured creditors, including but not limited to Carmen, L.L.C., SSJC and
MCANY for an amount in excess of the lawful amount RRLP owes Madison under the
Madison Loan and, or to obtain a lien on the Property to secure the same, of any type or
priority, Paradigm could only do so by obtaining an order of the Bankruptcy Court,
pursuant to a proceeding about which all of the secured creditors were properly notified.
This would be the case no matter what the amount that Paradigm may loan in excess of
the purported Madison Debt would be used for, including, but not limited to establishing
an interest reserve and closing costs associated with the Paradigm Loan, with any
remaining balance to be allocated to be used for improvements to the subject property
and the remaining amount for the borrower's professional fees.

4. RRLP has been advised that, if Nancy Armano were to attempt to use the
proceeds of the Paradigm Loan to simply pay off the Madison Loan, as indicated in
Paradigm's commitment, Paradigm could only be granted a first lien to secure any
amount loaned, or a junior lien to secure any amount loaned with the approval of the
Bankruptcy Court, pursuant to a proceeding about which all of the secured creditors were
properly notified

5. RRLP has not been informed as to how Madison arrived at the amount
Madison, per the Legal Notice, purports to be owed by RRLP under the Madison Loan

6. RRLP has been advised that the Collateral Assignment of the Leases and
Rents under the Madison Loan by MCANY of Richmond Fund 11 Limited Partnership
("MCANY") to Madison, which was not signed by an officer of MCANY, but was
signed by Nancy Armano, does not constitute a valid or relevant assignment. RRLP has
been further advised that MCANY's alleged warranties, as set forth in the first full
paragraph on page 2 of said assignment, with respect to "Assignor being the sole owner
of the entire lessor's interest in the leases", and that "none of the rents reserved in the
leases had been assigned to or otherwise pledged or hypothecated by MCANY, other than
as collaterally assigned the landlord's interest under each lease to Warren Bank,
are worthless. This is the case because when MCANY allegedly assigned its interests in

Letter to Madison and Paradigm
Page 4, October 10, 2008

the leases and rents to Madison, MCANY no longer had any interests in the same to
assign, as MCANY had previously pledged the Intermediate Lease to SSJC, pursuant to
which MCANY gave SSJC a security interest in all of its right, title and interest in the
leases and rents. It did so under a certain Stipulation Resolving Claims (Section 3(d) on
page 10), that settled certain disputes between RRLP, SSJC, Nancy Armano, myself and
others, which was approved by the Bankruptcy Court in August of 2006 ("Stipulation")
Candidly, I would not be surprised if MCANY were to not know anything about this so
called assignment.

7. By information and belief, SSJC did not grant a separate assignment of the
leases and rents to Madison, pursuant to the closing of the Madison Loan, and has not
done so since said closing. Further, if SSJC has done so, it has done so without the
knowledge and approval of TYR. TYR would be, under the current circumstances,
opposed to SSJC granting such an assignment.

8. RRLP has been advised that the Collateral Assignment of the Servicing
Agreement under the Madison Loan was not a valid and legally compelling assignment.
This is because MCANY, a critical party to the Servicing Agreement, was not a party to
the Collateral Assignment of the Servicing Agreement and said servicing agreement
provides that it may not be assigned by operation of law or otherwise, without the written
consent of the parties to the Servicing Agreement.

9. RRLP has been advised that SSJC does not have the right to execute any
documents on behalf of MCANY, with respect to the Paradigm Loan, as set forth in
Paradigm's contingent commitment letter, and MCANY is under no obligation to provide
the same. While, under the Stipulation, MCANY made SSJC's officers attorneys-in-fact
for MCANY and gave them the right to make, execute, consent to, etc., any and all
documents necessary to effectuate certain refinancings, said right was limited solely to a
refinance of the *Assigned Portion* or the *Encumbrances*, as set forth in Section 3(d) on
page 11 of the Stipulation. RRLP has been further advised that obtaining a financing to
pay off or purchase the existing DIP Loan would not be a refinance of the *Assigned
Portion* or the *Encumbrances*, as the *Encumbrances* are specifically defined in the
Stipulation in Section 5(e) on page 14, thereof.

10. RRLP also believes that, under the current circumstances, it would be
MCANY's position that, despite the fact that under the Stipulation, MCANY made
SSJC's officers attorneys-in-fact for MCANY and gave them the right to make, execute,
consent to, etc., any and all documents necessary to effectuate certain refinancings, since
the Servicing Agreement specifically stated that it could not be assigned without the
written consent of all of the parties to the Servicing Agreement, it would be inappropriate
for an officer of SSJC to execute an assignment of the Servicing Agreement on behalf of

Letter to Madison and Paradigm
Page 5, October 10, 2008

MCANY, including, but not limited to doing so retroactively, without first obtaining MCANY's written consent. RRLP has been advised that it would be incumbent upon a lender that would require an assignment of the Servicing Agreement to, in the even an officer of SSJC attempted to sign such an assignment on behalf of MCANY, determine that MCANY had, in fact, agreed to said assignment.

11  TYR has not been consulted with by Nancy Armano, or SSJC's other officers, directors and counsel with regard to the Paradigm Loan. Since TYR has not been advised by Nancy Armano, et al. about the ramifications to and the efficacy of the Paradigm Loan, TYR is opposed to SSJC and Paradigm consummating the Paradigm Loan, at this time.

12. RRLP has not been consulted with by Nancy Armano et al about the Paradigm Loan. Since RRLP has not been advised by Nancy Armano, et al: about the ramifications to and the efficacy of the Paradigm Loan, TYR is opposed to SSJC and Paradigm consummating the Paradigm Loan, at this time.

13. RRLP has been advised that SSJC and its officers, directors and agents do not have the right to execute any documents of any type whatsoever, on behalf of RRLP and MCANY, with respect to the Paradigm Loan  This is the case, because, while under paragraph 5(e) of the Stipulation, RRLP: a) gave certain rights to SSJC to refinance the Property for certain specific purposes, as described in paragraph 5(E); b) agreed to cooperate with SSJC in SSJC's attempt to obtain such financings, and, c)  RRLP, as well as MCANY, constituted, appointed and empowered SSJC and each of the SSJC's authorized officers and attorneys-in-fact, with full power of substitution, as the true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to make, execute, verify, consent to, swear to, acknowledge, make oath as to, publish, deliver, file and/or record in the appropriate public offices (i) all certificates and other instruments including, at the option of the Reorganized Debtors, this Stipulation, that the Reorganized Debtors deem appropriate or necessary to enforce the foregoing rights, or (ii) any and all documents necessary to effectuate a financing or refinancing as described in paragraph 5(e), the Paradigm Loan is not a financing or refinancing as described in paragraph 5(e)

Based on the fact that the Bankruptcy Court retains exclusive jurisdiction over any action, suit, or proceeding by any person arising from or relating to the Note or the Mortgage, RRLP, hereby, requests that Madison immediately and permanently terminate the Foreclosure by Advertisement proceeding it initiated in Michigan, as well as any auction of the Property related, thereto

RRLP, hereby, further requests that Madison provide RRLP an accounting that would demonstrate how Madison determined what it is owed, as soon as is practical, but,

Letter to Madison and Paradigm
Page 6, October 10, 2008

in any event, prior to Madison attempting to exercise any remedies it believes may be available to it.

RRLP and TYR further request that Madison and Paradigm do not consummate a transaction, pursuant to which Paradigm consummates a loan to Nancy Armano or a related entity for the purpose of Nancy Armano or a related entity purchasing or paying off the Madison Loan, without having first obtained the written consent(s) of RRLP, TYR and MCANY

Please be advised that nothing contained, herein, constitutes, or represents an absolute or final position that RRLP or TYR has taken, is obligated to take, is bound to, or may not change or eliminate if litigation or any other type of legal proceedings, of any type, whatsoever, may arise, involving the parties referenced, herein, individually or collectively, and, or their agents, officers and directors, with respect to the Madison Loan and Paradigm Loan

Finally, despite the apparent gravity of this letter, RRLP and TYR would not be opposed to the Paradigm Loan, if all of the concerns and issues raised, herein, were resolved to the mutual satisfaction of all of the involved parties I apologize for not attaching copies of the documents I referred to, herein, but I know that Madison has copies and assume that Paradigm, being the professional real estate lender that it is, also has copies, by now If either of you should not have a copy(s), please feel free to ask me to provide you the same, which I will promptly undertake to do.

Thank you very much for your cooperation.

Sincerely,

Thomas L. Armano, Jr.

Cc.  Duffy and Atkins, L.L.P.
       Henry D. Becker, Esq.
       MCANY of Richmond Fund 11 Limited Partnership
       John M Beeding, Jr, Esq
       David H Freedman, Esq
       Richard Kruger, Esq.
       Carmen, L.L.C
       Michael Conway, Esq.

**Exhibit D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  | Chapter 11 |
|---|---|

In re:

SCARBOROUGH-ST. JAMES CORPORATION, et al.,     Case No. 03-17966 (JMP)

Debtors.     (Jointly Administered)

## AMENDED ORDER ON DEBTORS' JOINT MOTION FOR AN ORDER AUTHORIZING DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, GRANT SECURITY INTERESTS AND SUPER PRIORITY CLAIMS AND PROVIDE ADEQUATE PROTECTION PURSUANT TO SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Upon the joint motion (the "Motion")[1] of Scarborough-St James Corporation ("SSJC"), First Richborough Realty Corporation ("FRRC") and Richmond Realty Limited Partnership ("RRLP"), collectively, the debtors and debtors-in-possession in these Chapter 11 cases (the "Debtors"), for entry of an order authorizing RRLP (i) to incur post-petition secured indebtedness pursuant to a credit agreement (the "DIP Loan Agreement")[2] dated January 11, 2007, by and between RRLP and Madison Realty Capital L.P. (the "Lender"), and (ii) to grant a security interest and a Superpriority claim pursuant to sections 105(a) and 364(c) and (d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having requested that:

---

[1] All terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement, as defined below, as applicable.

[2] The DIP Loan Agreement and the other agreements, instruments and other documents executed in connection therewith are collectively referred to herein as the "DIP Loan Documents."



(a) the Court authorize RRLP, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, to obtain from the Lender, advances up to an aggregate principal amount of $3,100,000 (the "DIP Loan"), with such advances to be made in accordance with the DIP Loan Agreement annexed to the Motion. RRLP will use the proceeds of the DIP Loan to finance its working capital and other general corporate purposes (including the repayment of approximately $2,000,000 to satisfy the Warren Bank and Carmen Liens and $450,000 to SSJC in partial satisfaction of the SSJC Lien), and to pay transaction costs in connection with the DIP Loan Documents;

(b) the Court issue an Order, pursuant to sections 364(c)(1), (2) and 364(d)(1) of the Bankruptcy Code, that the obligations of RRLP under the DIP Loan Agreement (the "DIP Obligations") (i) be granted Superpriority administrative expense status, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and (ii) be secured by perfected first priority security interests in and lens on all unencumbered pre-petition and post-petition property of RRLP excluding the Avoiding Power Causes of Action (the "Assets"), and (iii) be secured by perfected priming liens on all Assets, priming all existing secured creditors, including without limitation, Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, provided, however, that the claims and liens arising under clauses (i), (ii) and (iii) above are subject to the Carve-Out, as described below;

(c) the Court issue an Order approving the adequate protection regime structured by RRLP to protect the Pre-petition Lenders for any diminution in the value of their interests that occurs as a result of the granting of the Priming Liens as set forth in the Motion;

2



(d) the Court conduct a hearing to consider approval of the post-petition financing pursuant to the DIP Loan Agreement and authorizing RRLP to obtain advances thereunder in an aggregate principal amount of up to $3,100,000;

the Court finds, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Hearing given to (a) counsel for the Lender, (b) counsel to Warren Bank, (c) counsel to Carmen, (d) counsel for SSJC and FRRC; (e) counsel to BLG; (f) counsel to C&R; (g) counsel to RGE; (h) the twenty (20) largest unsecured creditors, (i) all known creditors who have a lien against RRLP's assets, (j) the Internal Revenue Service, (k) all state and local taxing authorities in the locations where RRLP conducts business, (l) the United States Attorney and (l) the United States Trustee (the "US Trustee") (collectively, the "Notice Parties") was good and sufficient under the particular circumstances and no other or further notice is or shall be required; and

based upon all of the pleadings filed with the Court, the evidence presented and the arguments of counsel made at the hearing on the Motion; and the Court having noted the appearances of all parties in-interest; and all objections to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court, and it appearing that the relief requested in the Motion is in the best interests of RRLP, its estate and its creditors, and such relief is essential for the operation of the Debtors' businesses; and it further appearing that RRLP is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or other secured financing on equal or more favorable terms than those set forth in the DIP Loan Documents; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefor;



**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED THAT:[3]**

1.      Disposition. The Motion is granted in its entirety on the terms of this Order. Any objections to the relief sought in the Motion that have not previously been resolved or withdrawn are hereby overruled on their merits. This Order shall be valid, binding on all parties-in-interest and fully effective immediately upon entry.

2.      Jurisdiction; Venue. The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of these Chapter 11 Cases and the Motion is proper under 280 U.S.C. §§ 1408 and 1409.

3. Purpose and Necessity of Financing. RRLP requires the financing described in the Motion to fund its operations pending a sale of some or all of the Shopping Center pursuant to a Plan of Reorganization. RRLP is unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Loan Documents within the time frame required by its needs to avoid immediate and irreparable harm. A loan facility in the amount and in the manner provided by the DIP Loan Documents is not available to the Debtors, generally, without granting to the Lender pursuant to sections 364(c)(1),(2) and 364(d) of the Bankruptcy Code, the following: (i) superpriority administrative expense status, having priority over any and all administrative expenses of the kind specified in, or arising or ordered under sections 503(b) and 507(b) of the Bankruptcy Code, and (ii) first priority, perfected security interests in and liens on all Assets, (iii) secured by

---

3 Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.



perfected priming liens on all Assets, priming all existing secured creditors, including without limitation, Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, provided, however, that the claims and liens arising under clauses (i), (ii) and (iii) above are subject to the Carve-Out. After considering all the alternatives, RRLP has concluded in the exercise of its prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best financing available to RRLP.

4. Good Cause. RRLP's ability to obtain sufficient liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors because the Debtors need to continue to operate their businesses pending a sale of some or all of the Shopping Center pursuant to a Plan of Reorganization. The preservation of the going concern value of the Debtors' businesses is the linchpin to any successful reorganization. Good cause thus has been shown for the relief sought in the Motion.

5. Good Faith. The terms of the DIP Loan Documents, including the interest rates and fees applicable thereto, are at least as or more favorable to RRLP as those available from alternative sources. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length between RRLP and the Lender. The DIP Loan and other financial accommodations made to RRLP by the Lender pursuant to this Order, the DIP Loan Agreement and the other DIP Loan Documents shall be deemed to have been extended by the Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the Lender shall be entitled to all protections afforded thereby. The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect RRLP's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

5



6.      Superpriority Claim and Lien Priority.

(a)   The Lender is hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in the aggregate principal amount of up to $3,100,000, together with all interests, fees and other amounts payable pursuit to the DIP Loan Documents, having priority over any and all administrative expenses of the kind specified in or arising under sections 503(b) and 507(b) (except as otherwise expressly provided for in the Carve-Out). The Superpriority Claim does not extend to proceeds from Avoiding Power Causes of Action.

(b)   Further, as security for the DIP Obligations, in accordance with the terms of the DIP Loan Documents and this Interim Order, effective immediately, the Lender is hereby granted a first priority, perfected security interests in and liens on all unencumbered pre-petition and post-petition property of RRLP (excluding the Avoiding Power Causes of Action).

(c)   As security for the DIP Obligations, in accordance with the terms of the DIP Loan Documents and this Interim Order, effective immediately, the Lender is hereby granted, pursuant to sections 364(c) and (d) of the Bankruptcy Code, perfected priming liens in the Assets (the "Post-Petition Liens"), senior in all respects to any and all present and future liens, claims, interests or encumbrances, if any, including, without limitation, any and all pre-petition and post-petition liens and security interests held by Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, as further described in the DIP Loan Agreement.

(d)   No lien or security interest granted to the Lender under this Order or the DIP Loan Documents, as approved by this Order, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of RRLP's estate under section 551 of the Bankruptcy Code or (ii) hereafter be subordinated to or made *pani passu* with any other lien or

6



security interest pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise. The Post-Petition Liens arising hereunder shall be and hereby are fully perfected security interests, such that no additional steps need be taken by the Lender to perfect such interests.

(e) The Post-Petition Liens and Superpriority Claim granted to the Lender under this Order shall continue in this and in any superseding case for RRLP under any chapter of the Bankruptcy Code, and such liens and security interests shall maintain their priority as provided in this Order until all the DIP Obligations have been paid in full, with the proviso that such Post-Petition Liens and Superpriority Claim shall not alter the priority scheme of Bankruptcy Code section 72 6(b). In addition, except as otherwise set forth herein, and in furtherance of the rights of the Lender under the DIP Loan Documents and this Order, neither Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R nor RGE, nor any of their successors or assigns, shall seek to enforce, or otherwise exercise any of their rights and remedies in respect of, the liens held by them in any of the Assets unless and until the DIP Obligations have been indefeasibly paid in full and the DIP Loan Documents have been terminated.

7. Adequate Protection. The adequate protection regime proposed by RRLP in the Motion is approved as follows:

(a) Property Taxes. RRLP is directed to place a portion of the DIP financing proceeds, $85,000.00, into an escrow account controlled by its counsel for the purpose of paying any unpaid real property taxes which were due as of the RRLP Petition Date (the "Unpaid Taxes"). The Macomb County Michigan Treasurer's Office and the Office of the City Treasurer for the City of Richmond, Michigan are hereby granted a replacement lien on such account in an amount sufficient to cover the Unpaid Taxes. Once the Unpaid Taxes are paid, any remaining amounts in this account shall be returned to RRLP

7



for the purpose of paying administrative and general operating expenses in these bankruptcy cases. RRLP shall settle an order relating to the payment of the property taxes.

(b) Warren Bank Lien/Carmen Lien. RRLP is directed to place a portion of the DIP financing proceeds, $2,348,269.20, into an escrow account controlled by its counsel for the purpose of paying the Warren Bank Lien (the "Loan Repayment"). Any payment to Warren Bank by RRLP shall have the effect of reducing, on a dollar for dollar basis, any liability owed by RRLP under both the Warren Bank Lien and the Carmen Lien subject to a right of Carmen to review and object to the ultimate payment by RRLP to Warren Bank and, upon full payment of the Warren Bank Lien, all security documents executed by RRLP in favor of either Warren Bank or Carmen in connection with the Warren Bank Liens shall be cancelled and deemed null and void, except for the Carmen Mortgage, defined as that certain Commercial Wrap Mortgage from RRLP to Carmen, filed of record August 6, 2004 in Liber 15738, page 689, in the original principal amount of $2,000,000.00, which Carmen Mortgage is subordinated by this Order to the Post-Petition Liens and Superpriority Claims granted to the Lender, and which Carmen Mortgage shall continue to secure any and all additional amounts determined to be due to Carmen under the Carmen Lien as shall be set forth in a further Order of this Court after conclusion of any claims allowance process. Moreover, if at some future date Carmen shall determine that changed circumstances have left it not adequately protected, it may make an appropriate motion addressing this issue. Warren Bank is hereby granted a replacement lien on this account and, immediately upon the funding of this account, any security interest of Warren Bank or Carmen in the leases, rents or profits from the



Shopping Center shall cease and such rents and profits shall thereafter be paid pursuant to the Intermediate Lease and Servicing Agreement, as set forth in this Court's August 9, 2006 Order approving that certain June 26, 2006 Stipulation Resolving Claims, except with respect to the rents paid by Kmart, which shall be paid in accordance with the DIP Loan Agreement. RRLP shall settle an order relating to the payment of the Loan Repayment.

(c) SSJC Lien. RRLP is directed to pay, upon the closing of the DIP Loan, a portion of the DIP financing proceeds, $450,000.00, to SSJC as partial satisfaction of the SSJC Lien. This payment shall not alter the continued effect of the SSJC Lien on the Shopping Center, as primed, by the Lender's Superpriority liens granted herein.

8. Acknowledgements. In providing for post-petition financing under the DIP Loan Agreement, RRLP acknowledges, represents, stipulates and agrees that:

(a) RRLP has obtained all authorizations, consents and approvals required to be obtained from, and has made all filings with and given all notices required to be made or given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which RRLP is a party;

(b) in entering into the DIP Loan Documents, and as consideration therefor, RRLP hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Agreement, RRLP shall not in any way prime or seek to prime the liens provided to the Lender under this Order or the DIP Loan Documents in the Collateral by offering a subsequent lender or a party-in-interest a superior or *pani passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise;

9



(c) in entering into the DIP Loan Documents, and as consideration therefor, RRLP hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Agreement, RRLP shall not in any way or at any time, suffer to exist a priority for any administrative expense or unsecured claim against RRLP of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, sections 503(b) and 507(b) of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the DIP Obligations, as provided herein;

(d) there are no other liens on or security interests in the Collateral except for the Permitted Liens and the liens held by the Lender.

9. Fees. All fees payable and costs and/or expenses reimbursable under the DIP Loan Agreement and other DIP Loan Documents by RRLP to the Lender, are hereby approved and shall be promptly paid in full by RRLP in accordance with this Order and the DIP Loan Documents, and RRLP is hereby authorized to pay all such fees without the necessity of RRLP or the Lender filing any further application with the Court for approval or payment of such fees or expenses. All fees and costs and/or expenses payable by RRLP in connection with the recording, filing and insuring of financing statements, mortgages and financing statements, if any, to confirm the perfection of the security interests granted or authorized by this Order are hereby approved and shall be promptly paid in full by RRLP without the necessity of RRLP or the Lender filing any further application with the Court for approval or payment of such fees, costs and/or expenses.

10. Authority to Execute and Deliver Necessary Documents. RRLP is hereby authorized and empowered to enter into and deliver the DIP Loan Agreement in the form annexed hereto and the other DIP Loan Documents. RRLP is hereby further authorized,



10

empowered and directed (a) to perform all of its obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in the DIP Loan Documents as approved by this Order, (b) to perform all acts required under the DIP Loan Documents and this Order, including, without limitation, and when applicable, the payment of all principal, interest, charges, fees, and the reimbursement of present and future reasonable costs and expenses paid or incurred by the Lender as provided for in this Order, the DIP Loan Agreement, and the other DIP Loan Documents, all of which unpaid principal, interest, charges, fees and the reimbursement of present and future reasonable costs and expenses shall be included and constitute part of the principal amount of the DIP Obligations, be deemed a Superpriority Claim having the same priority as all other DIP Obligations hereunder and be secured by a first priority lien on and security interest in all of the Collateral as and to the extent provided for in this Interim Order, the DIP Loan Agreement, and the other DIP Loan Documents, and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be required or necessary for RRLP to perform all of its obligations under this Order and the DIP Loan Documents, without further order of the Court. The DIP Obligations shall constitute valid and binding obligations of RRLP in accordance with the terms of this Order.

11. Amendments. RRLP, only with the express written consent of the Lender, may enter into any amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or order of this Court, provided that (i) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest, (ii) notice of any such amendment or modification is filed with the Court, and (iii) notice of any such amendment or modification (other than those which in the

11



reasonable view of RRLP are ministerial, technical or do not adversely affect RRLP), if any, are provided in advance to all parties having filed a notice of appearance pursuant to Bankruptcy Rule 2004 that was entered on the docket prior to the date of the filing of such amendment or modification with the Bankruptcy Court, and the Office of the U.S. Trustee.

12.     Carve-Out Expenses. A Carve-Out from the liens and claims granted to the Lender will apply in the following circumstances: (a) in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), the payment of (i) accrued and unpaid professional fees and disbursements theretofore incurred as of the occurrence and during the continuance of an uncured or un-waived Event of Default, and (ii) professional fees and disbursements incurred during the time of such continuance in an aggregate amount not in excess of $200,000, by RRLP and allowed by an order of the Bankruptcy Court under §§330 and 331 of the Bankruptcy Code; (b) the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court (the "UST/Clerk Fees"); and (c) and reasonable fees and expenses of a trustee under Bankruptcy Code section 726(b). The DIP Loan Agreement provides that so long as no Event of Default (or event which with the giving of notice or lapse of time or both would constitute an Event of Default) has occurred, RRLP will be permitted to pay compensation and reimbursement of expenses allowed and payable under §§330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out.

13.     Additional Perfection Measures. The liens, security interests, and priorities granted to the Lender pursuant to this Order and the DIP Loan Documents with respect to certain property of RRLP's estate shall be perfected by operation of law immediately upon entry of this Order by the Court. Neither RRLP nor the Lender shall be required to enter into or to obtain

12



landlord waivers, mortgagee waivers, bailee waivers or warehouseman waivers, if any, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office, or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interest and Post-Petition Liens granted pursuant to this Order. If the Lender, in its sole discretion, chooses to obtain consents from any licensor or similarly situated party-in-interest, to file financing statements, notices of lien or similar instruments, to record financing statements, mortgages or deeds of trust, or to otherwise confirm perfection of such security interests and liens: (a) the Lender is authorized and empowered to file or record financing statements, mortgages, deeds of trust or similar instruments which secure the DIP Obligations up to the aggregate principal amount of $3,100,000, together with all interests, fees and other amounts payable pursuant to the DIP Loan Documents; (b) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Order; and (c) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder. In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Lender may, at its sole discretion, choose to file a true and complete copy of this Order in any place at which any such instruments would or could be filed, together with a description of the Collateral located within the geographic area covered by such place of filing, and such filing by the Lender shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Order.



14. Payment of Administrative Expenses. Notwithstanding the foregoing, RRLP shall be permitted to pay, as the same may become due and payable, but solely to the extent permitted by the DIP Loan Documents, (i) administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of its business, (ii) payments pursuant to "first day" orders entered by this Court, (iii) compensation and reimbursement of expenses to professionals allowed and payable under section 331 of the Bankruptcy Code, and (iv) subject to the requirements of the Bankruptcy Code, any other administrative expenses and payments permitted under the DIP Loan Agreement.

15. Access to Information. Without limiting the rights of access and information afforded to the Lender under the DIP Loan Agreement and other DIP Loan Documents, RRLP shall permit representatives, agents and/or employees of the Lender to have reasonable access to its premises and its records during normal business hours (without unreasonable interference with the proper operation of RRLP's business) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

16. Cash Management System. RRLP is authorized and directed to maintain its cash management system in a manner consistent with the DIP Loan Documents.

17. Automatic Stay Modified. The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lender:

(a) upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, or any violation of a provision of this Order, and after thirty (30) business days' prior written notice to the counsel for Debtors, Carmen and the United States Trustee (such thirty (30) day period shall be inclusive of any notice of non-payment provided to Debtor prior to an Event of Default under the DIP Loan Documents), to declare all or any portion of the DIP Loan then outstanding to be immediately due and payable and exercise all other enforcement

14

rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents, this Order, or under other applicable bankruptcy and non-bankruptcy law without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay of section 3 62(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated as provided herein without the necessity of any further action by the Court in the event that the Debtors and/or the U.S. Trustee have not obtained an order from this Court to the contrary within such thirty (30) business days after receiving such notice from the Lender pursuant to this Order, provided, however, that such thirty (30) day period shall be inclusive of any notice of non-payment provided to Debtor prior to an Event of Default under the DIP Loan Documents. The Debtors and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to re-impose or continue the automatic stay of section 3 62(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default has occurred and is continuing;

(b) this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 3 62(a) of the Bankruptcy Code or other injunctive relief requested;

(c) upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, the Lender may, without providing any prior notice thereof, immediately charge default interest at the rate set forth in the DIP Loan Agreement; and

18. Successors and Assigns. The DIP Loan Documents and the provisions of this Order shall be binding upon the Lender, RRLP and their respective successors and assigns, and shall inure to the benefit of the Lender and RRLP and their respective successors and assigns including, without limitation, any trustee, responsible officer, examiner with expanded powers, estate administrator or representative, or similar person appointed in a case for RRLP under any chapter of

15

the Bankruptcy Code.

19.   No Third Party Beneficiary. Except with respect to the Debtors, the Lender, its delegates, successors and assigns, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

20.   Binding Nature of Agreement. Each of the DIP Loan Documents to which RRLP is and will become a party shall constitute legal, valid and binding obligations of RRLP, enforceable against RRLP in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the Lender by RRLP. The rights, remedies, powers, privileges, liens and priorities of the Lender provided for in this Interim Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in this case or in any subsequent case under the Bankruptcy Code, unless and until the DIP Obligations have first been paid in full and completely satisfied.

21. Subsequent Reversal or Modification. This Order is entered pursuant to section 364 of the Bankruptcy Code, granting the Lender all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by RRLP to the Lender prior to the date of receipt by the Lender of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by RRLP to the Lender prior to written notice to the Lender of the effective date of such action shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness,

16

obligation or liability.

22. No Waiver. This Order shall not be construed in any way as a waiver or relinquishment of any rights that the Lender may have to bring or be heard on any matter brought before this Court.

23. Conversion/Dismissal. No motion shall be filed by RRLP for, and RRLP shall not consent to any order dismissing or converting this Chapter 11 case under section 1112 of the Bankruptcy Code or appointing a chapter 11 trustee or an examiner with expanded powers, unless and until the DIP Obligations shall have been indefeasibly paid in full and completely satisfied. If an order dismissing this case under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (x) the liens, security interests, and Superpriority Claims granted to the Lender hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full and completely satisfied, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Superpriority Claims of the Lender, as the case may be.

24. Injunction. Except as provided in the DIP Loan Agreement and this Order, RRLP shall be enjoined and prohibited from, at any time during the Chapter 11 Case, (a) granting liens in the Collateral or portion thereof to any other parties, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, on a parity with or junior to the liens of the Lender and/or (b) (i) using the Collateral, and (ii) applying to any Court for an order authorizing the use of the Collateral, except in accordance with the DIP Loan Agreement.

25. Survival. Unless and until the DIP Obligations have been indefeasibly paid in full, (a) the protections afforded to the Lender under this Order, and any actions taken pursuant thereto shall survive the entry of an order (i) confirming a plan of reorganization; (ii) dismissing

17

this case or (iii) converting this case into a case pursuant to chapter 7 of the Bankruptcy Code,

(b) the Post-Petition Liens in and to the Collateral and the Superpriority Claim shall continue in these proceedings, in any such successor case or after any such dismissal. The Post-Petition Liens and Superpriority Claim shall maintain their validity and priority as provided by this and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of Indebtedness or any conversion of any of this Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of this Chapter 11 Case, by any act or omission until the DIP Obligations have been indefeasibly paid in full.

26. Priority of Terms. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Agreement or the DIP Loan Documents, the terms and provisions of this Order shall govern.

27. Adequate Notice. The notice given by the Debtors of the hearing on the Motion was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court. Under the circumstances, no other or further notice of the request for the relief granted at the hearing on the Motion is required.

28. Waiver of Requirement to File Memorandum of Law. The Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the requirement contained in Rule 9013-1 (b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted, is hereby waived.

29. Entry of Order; Effect. This Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Order on the Court's docket

in this Chapter 11 Case.

Dated: New York, New York
April 20, 2007

_s/ James M. Peck_
Honorable James M. Peck
United States Bankruptcy Judge

I hereby attest and certify on ⟨4·23·2007⟩
that this document is a full, true and correct
copy of the original filed on the court's
electronic case filing system.

Clerk, US Bankruptcy Court, SDNY

By: _____ Deputy Clerk



19